## Viener v. Jacobs

C.P. of Berks County, no. 563-95.

*Rees Griffiths* and *David M. Kozloff*, for plaintiff.
*Thomas C. Zielinski*, for defendants.

SCHAEFFER, *S.J.*, June 30, 2000 —

## I. INTRODUCTION

George P. Viener brought this suit against Neal
Jacobs, Norman Rush, Michael A. Joffred, Allen Fried-

man, N.G.N. Inc., Reading Garment Company Inc., Ellmar Manufacturing Inc., Nagan Leasing Inc., Energy Knits, Inc., Reading Dyeing and Finishing Inc., Little Creek Mills Inc., LCMA Inc., Amity Finishing Inc. and G.N.K Partnership.

Norman Rush, NGN, RGC, Ellmar, LCMA and Reading Dyeing have all been adjudicated bankrupt and all proceedings in this action are stayed as to them.

No evidence was presented at the non-jury trial which would make Nagan, Energy, Reading Dyeing, Little Creek, Amity or G.N.K. liable to Viener and, therefore, Nagan, Energy, Reading Dyeing, Little Creek, Amity and G.N.K. are dismissed as parties defendant.

Likewise, no evidence was presented at the non-jury trial which would make Joffred liable to plaintiff and therefore, Joffred is dismissed as a defendant. The parties have agreed that Friedman had no involvement in the decision made by NGN's Board of Directors to remove Viener as president or to terminate his employment, and plaintiff does not allege in his amended complaint that Friedman is one of the majority shareholders of NGN that breached his fiduciary duty to Viener. Furthermore, plaintiff is no longer seeking relief from this defendant. Therefore, Friedman is dismissed as a party.

That leaves Viener's claims against Jacobs to be resolved.

With the agreement of the parties, we bifurcated the trial, hearing evidence on liability only.

Viener claims Jacobs is liable to him for the following reasons:

"(1) for permitting NGN to remove him as its president and therefore as one of its corporate officers;

"(2) for permitting RGC to remove him as an officer;

"(3) for terminating his employment with RGC and NGN;

"(4) for freezing him out as a minority stockholder of NGN and RGC and preventing him from exercising a position with the corporations."

Plaintiff also claims Jacobs is liable to him for punitive damages because he, Jacobs,[1] as a majority shareholder in RGC and NGN, was guilty of outrageous conduct toward him, Viener, in the manner in which Jacobs treated Viener, a minority stockholder in each of these corporations.

Viener seeks compensation for the salary he lost from the date of his termination with NGN and RGC and to compel Jacobs to purchase his stock in NGN and RGC for a value that will fairly and adequately compensate Viener for his investment in NGN and RGC as of the end of 1994.

Plaintiff also seeks a constructive trust over Jacobs' shares in LCMA and the remaining non-bankrupt corporation, Energy Knits.

Viener argues as one basis for his right to recover against Jacobs is that Jacobs conspired with Rush, Joffred and Friedman to deprive Viener of his rights as a minority shareholder.

---

1. Viener had also asked that a receiver be appointed for NGN and RGC. The court granted his request, a receiver was appointed and then removed, Viener does not now seek a receiver for NGN or RGC; the companies are in bankruptcy.

Plaintiff's claim seeking repayment of the sums advanced by NGN and RGC to defend this suit is a claim which affects the rights and obligations of NGN and RGC and is in the nature of a minority stockholder's derivative suit. Therefore, since NGN and RGC are now in bankruptcy, we cannot proceed to consider or resolve these issues at this time.

## II. FINDINGS OF FACT

(1) The plaintiff in this action is George P. Viener, an adult individual who resides at 1515 Rockland Street, Reading, Pennsylvania.

(2) The individual defendants in this action are Neal Jacobs, of 8 Wyndham Hill, Reading, PA 19606, Norman Rush, 36 Hickory, Englewood Cliffs, NJ 07632, Michael Joffred, of 821 Carman Drive, Wyomissing, PA 19610, and Allen Friedman of 5 Medline Avenue, Monticello, NY 12701.

(3) Viener brought this action in his own name and derivatively as a shareholder of NGN Inc. and Reading Garment Company.

(4) NGN is a corporation existing under the laws of Pennsylvania and, at the time it went into bankruptcy, had its principal office and place of business at 601 Heister Lane, Reading, Berks County, Pennsylvania 19605.

(5) Viener, Jacobs and Rush each own respectively 10 shares (or 33 1/3 percent) of the issued and outstanding stock of NGN.

(6) Viener, Jacobs, Rush and Friedman own respectively 25 percent of the issued and outstanding stock of RGC.

(7) NGN, RGC and Rush are in bankruptcy and these proceedings are stayed as to these defendants.

(8) George Viener and his father Reuben Viener had been in the textile manufacturing business in the Reading/Allentown area for more than 50 years. (Exhibit 1, p. 18, ¶24.)

(9) Viener initially hired Jacobs as a plant manager in his father's business (the predecessor to NGN) in 1969. *(Id.)*

(10) After a one-year probationary period, Jacobs was offered and accepted a 20 percent ownership in the Viener family business, which was given to him by transferring 5 percent of the issued stock in each of four successive years. *(Id.)*

(11) In 1981, after closing Arkay Knitting Mills, Viener and Jacobs began producing garments for a company which employed Rush, who had been Vieners' fraternity brother and friend during their college years at the University of Pennsylvania. (Exhibit 1, p.19 ¶25.)

(12) When Viener, Jacobs and Rush considered forming their own company, Viener's knowledge and experience with the administrative ends of the business were essential to setting up the new venture, NGN (the acronym for the first names of the three owners), which then began business on January 1, 1983. (Notes of Testimony Viener, 8/11/97, p. 99.)

(13) At the time NGN was formed, Viener supplied the building on McKnight Street rent free from which NGN conducted its operations; his family did not add on any profit margin for the building. (N.T. Viener, 8/3/99, p. 278; N.T. Viener, 8/11/97, pp. 100-101, 249-50.)

(14) Viener, Rush and Jacobs incorporated their new venture to obtain the benefits of limited liability; they also elected subchapter S status (except for Ellmar), which resulted in corporate income being reported and taxed to them as though they were partners. (Exhibit 1, p. 20 , ¶ 32.)

(15) After incorporating, Viener, Rush and Jacobs constituted the entire board of directors of the new entity, NGN; the board met at least four times a year. (*Id.;* N.T. Viener, 8/7/99, p. 361.)

(16) Viener was selected as president of NGN, Rush as vice-president of sales and treasurer, and Jacobs as vice-president of manufacturing and secretary. (Exhibit 1, p. 20, ¶32.)

(17) Although each of Jacobs, Rush (majority shareholders) and Viener (minority shareholder) made different contributions to the start-up of the business, they agreed that each would own a third of the issued and outstanding stock of NGN. (Exhibit 1, p. 20, ¶33.)

(18) Moreover, although their respective positions, duties and contributions to the ongoing success of NGN were in all cases unique and different from the others, these three owners/shareholders each received compensation and benefits equal to that received by the other after 1984. *(Id.)*

(19) The owners equally received additional distributions in excess of their base salaries of $150,000 each, luxury cars as an element of their compensation, disability insurance which provided for $8,000 per month for the duration of any disability of a shareholder, and comprehensive life insurance. ( Exhibit 1, pp. 9-12, ¶¶11, 15d, 15e and 15f; N.T. Viener, 8/11/97, p. 158.)

(20) Viener averaged between $300,000 and $375,000 per year in salary and distributions from NGN; in some years he got up to $450,000. (N.T. Viener, 8/11/97, pp. 161, 164.)

(21) Shareholders maintained loan accounts with the corporation which contributed to the corporation's working capital and earned interest at the rate of 12 percent per annum; the shareholders took their distributions and then loaned the money back to NGN as part of its capital account to grow the business. (Exhibit 1, p. 12, ¶15g; N.T. Viener, 8/11/97, p. 166.)

(22) The corporation and shareholders did not execute any notes or loan agreements; there were no agreements or understandings as to the terms or timing of payments; and the shareholders made advances or withdrawals on an irregular basis. (Exhibit 1, p. 13, ¶15h.)

(23) Viener, Rush and Jacobs entered into a shareholder agreement to provide for continuity in the management of the business and affairs of NGN. (Exhibit 1, P. 8, ¶9; exhibit 5.)

(24) The shareholder agreement provided for a voluntary sale or buyout of stock at book value. (Exhibit 5, p. 3, ¶2(c).)

(25) The shareholder agreement did not create any rights to employment or continued employment of any party thereto by a corporation or by an individual or entity affiliated with any corporation, and specifically said so. (Exhibit 5, p. 8, ¶7.)

(26) None of the shareholders had written contracts of employment with NGN or RDC. (Exhibit 1, p. 45, ¶ 90.)

(27) Viener served as president of NGN from its inception to August 4, 1994. During Viener's term as president, NGN grew dramatically, vertically integrating into related textile businesses and, through 1992, was consistently and increasingly profitable. (Exhibit 1, p. 21, ¶34.)

(28) As president of NGN, Viener had the following duties: yarn purchasing; costing garments; fabric development; retail sales; sales of close-outs/irregulars; and some responsibility for the company's administrative duties, including accounting and financial reporting, human resources (hiring and firing), financing, insurance and leases. (Exhibit 1, p. 46, ¶94.)

(29) As an owner/investor and officer of NGN and RGC, Viener received detailed information regarding its operations and performance on a regular basis, including, inter alia, weekly reports with respect to NGN's and RGC's production, shipping, accounts receivable and cash flow; information regarding the status of NGN's and RGC's financing and relationships with lenders upon request; planning information regarding expansion and acquisition of new facilities; and budgeting information. (*Id.,* p. 15, ¶19.)

(30) In addition, Viener had access to all of NGN's and RGC's facilities and employees, and to NGN's and RGC's affiliates. (*Id.,* ¶20.)

(31) The owners/shareholders, from the beginning, critiqued and complained of each others' work performances. (N.T. Viener, 8/11/97, pp. 197-98.)

(32) NGN's profit margin began to decline: net sales and gross margins for 1992: $26.9 million, 21 percent;

for 1993: $29.3 million, 18 percent; for 1994: $33 million, 16 percent. (Exhibit 1, p. 23, ¶37.)

(33) Around 1993, when NGN lost money for the first time, Rush increased his complaints about Viener's performance; pressure was starting to be exerted on Viener to improve his areas of responsibility, *i.e.*, inventory controls. (*Id.;* N.T. Joffred, 8/5/99, p. 389.)

(34) NGN grew tremendously and, prior to June 1994, Viener wanted to bring in professional management. (N.T. Viener, 8/11/97, p. 306.)

(35) Beginning in 1994, Viener expressed concerns regarding the management and operation of NGN which centered on, inter alia, cash payments being made by NGN to Kim Van Vu and N.V. Sportswear and the acquisition and location of machinery and equipment. (Exhibit 1, p. 25, ¶46.)

(36) N.V. Sportswear had grown to be one of NGN's largest subcontractors and Jacobs kept N.V. Sportswear in production full-time; payments were often made to Van Vu in cash for the cheap T-shirt line, these grew to $1,200 per week. (Exhibit 1, p. 17, ¶ 23 b.)

(37) Viener asked Michael Joffred, auditor to NGN, to check into the legality of the cash payments being made to N.V. Sportswear; NGN's board was advised by Robert Firely of Beard & Co., at its meeting on May 18, 1994, that the cash payments to Kim NV, Inc. were okay since her entity was a corporation. (N.T. Viener, 8/7/99, p. 358; exhibit 18.)

(38) At the time Beard & Co. advised the NGN board that cash payments to subcontractors were acceptable, Viener was heavily dependent on Joffred's advice and counsel and relied on it in permitting continued cash

payments to Kim Van Vu at Jacobs' request. (N.T. Joffred, 8/5/99, p. 388.)

(39) Around July of 1994, Viener told Rush that he was thinking about bringing professional management into the company. (N.T. Viener, 8/11/97, pp. 308-309.)

(40) Rush told Viener that he was thinking of bringing Michael Joffred in as president of NGN. *(Id.)*

(41) Joffred had experience in the systems area including inventory, production, data processing, computer systems, including both hardware and software applications. (Exhibit 1, p. 49, ¶104; N.T. Rush, 8/4/99, pp. 218-22, 370-71.)

(42) On August 4, 1994, at a board of directors' meeting, Rush and Jacobs voted to remove Viener as president of NGN. (Exhibit 1, p. 33, ¶ 58; exhibit 56).

(43) Viener was then elected vice-president of NGN. *(Id.,* ¶60.)

(44) Viener's salary after his demotion remained the same as when he was president.

(45) Viener's duties after his demotion were to be as he was, from time to time, assigned.

(46) NGN's by-laws provide that any officer or agent elected or appointed by the board of directors may be removed by the board whenever in its judgment the best interests of the corporation will be served thereby, (Exhibit 16, article V, ¶3.)

(47) Joffred attended the meeting on August 4, 1994 whereby Rush told Joffred that if Joffred became president, Joffred could fire Viener, Jacobs or Rush; Viener did not object. (N.T. Viener, 8/11/97, pp. 205-206.)

(48) Prior to August 4, 1994, Rush only had one discussion with Joffred to determine if Joffred had any interest in becoming president of NGN and Joffred was not interviewed until that date; Joffred was never told that Viener would be removed as president on August 4, 1994. (Exhibit 1, p. 49, ¶¶105, 107, 106.)

(49) The day after the interview, Viener told Joffred to accept the position of president of NGN because there was a real opportunity there for Joffred. (N.T. Joffred, 8/5/99, pp. 433-34.)

(50) At a meeting on August 12, 1994, Rush told Viener that he considered him to be a bad businessman and he had been trying to get rid of him for 12 years. Rush also told Viener that the profit margins were getting lower and NGN needed to save Viener's salary. (N.T.Viener, 8/7/97, p. 128.)

(51) On September 19, 1994, Viener, through counsel, forwarded a proposed amendment to the shareholder agreement which, among other things, provided for continued employment for Viener at a compensation equal to Jacobs and Rush.

(52) At the board meeting on September 20, 1994, Jacobs told Viener that Jacobs was willing to sign an agreement that his compensation would be the same as and never more than Viener's. On or about October 6, 1994, Rush and Jacobs, through their counsel, sent a draft contract which provided for continued employment for Viener at compensation equal to Jacobs. Neither agreement was signed. (Exhibit 1, p. 39, ¶ 66; exhibit 10.)

(53) Neither Rush nor Jacobs ever orally promised Viener that he would have employment with NGN for life. (N.T. Viener, 8/11/97, p. 205.)

(54) In September 1994, Robert Firely, NGN controller, advised Jacobs that the $1,200 per week which was being credited as being paid on account for N.V. Sportswear was in fact for garment repairs and for debt on the marker making machine rather than for the cheap T-shirt program. (Exhibit 1, p. 28, ¶47d.)

(55) When Joffred became president in October 1994, he immediately adopted a policy prohibiting cash payments to subcontractors. (N.T. Joffred, 8/5/99, p. 585.)

(56) In late 1994, at Jacobs' direction, and despite NGN's termination of cash payments to subcontractors, Crown-Globe Inc. a subcontractor of NGN, generated invoices of approximately $53,276.59 for "price adjustments" to NGN, which were then paid by NGN. (N.T. 8/11/97, deposition of Doug Wolfe, pp. 46-52, 55-61.)

(57) These invoices were, in fact, not for price adjustments between Crown-Globe and NGN.

(58) Said invoices were not appropriate for NGN to pay as they were not for anything NGN had received from Crown-Globe, from Jacobs, from one Kim Van Vu or from anyone else.

(59) Douglas Wolfe was president of Crown-Globe at all times material to these proceedings.

(60) These invoices to Crown-Globe were devices by which NGN paid money to Jacobs and through Jacobs to one Kim Van Vu.

(61) Neither Jacobs nor Kim Vam Vu were entitled to receive this money from NGN.

(62) Jacobs caused NGN to pay the $53,276.59 represented by these invoices to Crown-Globe.

(63) Crown-Globe, by its president, Douglas Wolfe, then paid this $53,276.59, less a few dollars, to Jacobs. (N.T., 8/11/97, deposition of Doug Wolfe, p. 66.)

(64) Jacobs then paid this $53,276.59 to Kim Van Vu. (*Id.,* p. 65.)

(65) No invoices or bills had been presented to NGN, Crown-Globe, or from anyone justifying this payment to Kim Van Vu. (*Id.,* p. 69.)

(66) Neither Jacobs nor Kim Van Vu were entitled to this $53,276.59, or any part thereof.

(67) Viener, although he signed the checks payable to Crown-Globe for $53,276.59, did not know that the money paid Crown-Globe was for bogus invoices and did not know that the money was going to Jacobs and Kim Van Vu.

(68) Kim Van Vu was Jacobs' business associate in Reading and later in Mexico.

(69) By January 1995, Crown-Globe had sent invoices for an additional $48,135.61 to NGN. (N.T. Joffred, 8/6/99, pp. 584-85.)

(70) These additional invoices, like the original $53,276.59, were not for anything which NGN owed Crown-Globe, but, like the original invoices, were devices to get cash from NGN to Kim Van Vu.

(71) Neither Jacobs nor Kim Van Vu was entitled to the $48,135.61 represented by these additional invoices, or any part thereof.

(72) All said invoices, the ones for the original $53,276.59 as well as the additional ones for

$48,135.61, were ploys or devices to get this money to Kim Van Vu, without showing such payments to her, at a time when she was not entitled to all, or any part of this money.

(73) Jacobs' conduct in getting Crown-Globe to submit the phony invoices, in getting NGN to pay the phony invoices and in getting Crown-Globe to pay the money over to Jacobs so he could get cash to Kim Van Vu and N.V. Sportswear is outrageous conduct.

(74) On January 25, 1995, the plaintiff sent Joffred an e-mail questioning said invoices from Crown-Globe. (Exhibit 68.)

(75) Joffred confirmed Viener's suspicions and acknowledged that the bogus invoices were an inappropriate attempt by Jacobs to get cash to Kim Van Vu and N.V. Sportswear. (N.T. Joffred, 8/5/99, pp. 584-86.)

(76) Joffred, as president of NGN, stopped NGN from paying the invoices totaling $48,135.61 and they were never paid.

(77) N.V. Sportswear was an entity in which Kim Van Vu had a financial interest.

(78) Joffred began to consider firing Viener on or before December 4, 1994. On January 27, 1995, Viener was advised, in a letter from Jacobs' and Rushs' counsel, that the board had determined to terminate his employment. (Exhibit 1, p. 40, ¶¶72, 74; exhibit 66.)

(79) On February 3, 1995, upon recommendation of Chairman Rush and Joffred, the board of directors of NGN, by a two to one margin, voted to terminate the employment of Viener. (*Id.,* ¶¶74, 133; exhibit 20).

(80) After the board terminated Viener's employment, Viener remained a director of NGN.

(81) Contemporaneously with Viener's discharge, Rush and Jacobs offered to purchase Viener's stock in NGN and RGC at its book value payable over five years or alternatively to sell their stock in NGN and RGC at its book value payable over five years; neither buyout took place. (Exhibit 1, p. 41, ¶76; N.T. Viener, 8/7/97, p. 387.)

(82) In 1995, shortly after Viener's termination, NGN ceased its practice of having regular quarterly board meetings. (N.T. Viener, 11/6/98, p. 133.)

(83) The locks on the doors at NGN and Ellmar were changed so Viener no longer had physical access to the facilities; Jacobs had a set of keys, but Viener did not. (*Id.;* N.T. Jacobs, 8/3/99, p. 116.)

(84) A memo was sent to all employees that if they spoke to Viener, they would be fired. (N.T. Viener, 11/6/98, p. 133.)

(85) Viener was excluded from compensation decisions by setting up an officer and employee compensation committee consisting of all the other shareholders and directors and Joffred (Exhibit 1, p. 34, ¶61d.)

(86) Viener was excluded from meetings with lenders and factors and he was not provided with detailed financial information regarding the business' progress, except for quarterly and annual financial statements; he was unable to obtain information about what was going on in the companies except through the process of discovery in this litigation. (*Id.,* ¶61 I; N.T. Viener, 8/11/97, p. 139.)

(87) Among the reasons for which the board fired Viener was the fact that Viener asked questions. (N.T.

8/11/97, pp. 134-35, deposition of Steve Adams, 3/11/96.)

(88) Although NGN and RGC experienced their best two quarters of sales during the first half of 1995, sales fell off during the second half of 1995. (Exhibit 1, p. 23, ¶ 38.)

(89) During 1995, NGN and RGC sustained losses of $900,000. During 1996, NGN and RGC sustained losses of $2.33 million. (Exhibit 1, p. 39, ¶ 69.)

(90) No action was taken against Rush or Jacobs because of their deficient performances because bringing any more lawsuits on the company would have been a disaster. (N.T. Joffred, 8/5/99, pp. 522-32.)

(91) In late 1995, Jacobs was attempting to acquire an interest in Amex, a facility in Mexico. (N.T. Joffred, 7/10/98, pp. 128, 134.)

(92) NGN had been looking for a sewing facility offshore or in Mexico but had not obtained one. *(Id.)*

(93) NGN loaned machinery it owned, as is common practice in the apparel industry, valued at approximately $218,000, to Amex at Jacobs' request and with his consent. (N.T. Joffred, 7/10/98, pp. 127-29; N.T. Rush 8/4/99, pp. 259-61.)

(94) In December 1996, NGN was short of working capital. (N.T. Joffred, 7/10/98, p. 133.)

(95) At that time, Jacobs withdrew $202,216.67 from NGN, out of his loan account, for the purchase of the equipment that had been shipped to Amex. (N.T. Joffred, 7/10/98, pp. 131-33; exhibit 29.)

(96) The balance of the equipment was not purchased by Jacobs for Amex; nor was the equipment Jacobs ob-

tained by reducing his loan account ever returned to NGN. (N.T. Joffred, 7/10/98, p. 133.)

(97) Jacobs withdrew said $202,216.67 without the consent or prior knowledge of the plaintiff.

(98) In or about 1997, Jacobs and Van Vu bought a facility, Kimmex, for themselves in Mexico. (N.T. Jacobs, 10/13/98, p. 33.)

(99) NGN paid the costs of Jacobs' and Van Vu's trips to Mexico even though they purchased the facility they located in their own names. *(Id.)*

(100) Jacobs transferred equipment located at Amex to Kimmex, during January through July 1997; the rest of the equipment located at Amex was sold and the money was reinvested in equipment for Kimmex. (N.T. Jacobs, 10/13/98, p. 208; N.T. Joffred, 7/10/98, pp. 152-55); exhibit 30.)

(101) Included in Jacobs' transfers of equipment from Amex to Kimmex was $15,730 worth of equipment directly owned by NGN. (N.T. Jacobs, 10/13/98, pp. 194-96, 208; exhibit 30.)

(102) NGN never got this equipment back and was never paid for it.

(103) NGN never received any benefit or thing of value from Kimmex. (N.T. Jacobs 10/13/98, pp. 33-34.)

(104) Neither Jacobs nor Kim Van Vu ever gave the plaintiff an opportunity to invest in Kimmex. (N.T. Jacobs, 10/13/98, pp. 33-34.)

(105) By the end of 1996, Jacobs did not do things for NGN which he should have done to improve production. (N.T. Joffred, 7/10/98, p. 144.)

(106) J.C. Penney, a major client of NGN, demanded that Joffred take over responsibility for quality control from Jacobs because of its concerns about the quality and timeliness of deliveries. (N.T. Joffred, 8/5/99, pp. 522-24.)

(107) In June or July of 1997, two months before the trial in this lawsuit, Rush and Friedman stopped accepting orders for NGN and RGC, despite the fact that during the prior six months, NGN and RGC had sold approximately $18 million worth of goods, had paid off its $500,000 overadvance, and was still an ongoing concern. (N.T. Joffred, 7/10/98, pp. 138-40.)

(108) At least part of the reason Rush and Friedman stopped accepting orders for NGN and RGC was the Viener litigation. *(Id.)*

(109) Prior to the shutdown of NGN, a turnaround specialist had been brought in and determined that the company could go forward, but not with Rush and Friedman. (N.T. Joffred, 8/5/99, pp. 538-41.)

(110) There was no evidence presented that the consultant's conclusions were even presented to the board and shareholders of NGN, or even timely disclosed to Viener.

(111) The losses which NGN and RGC sustained in 1995 and 1996 consumed close to 90 percent of their net worth *(Id.,* p. 43, ¶82.)

(112) The decline in the sales and margins of NGN was multidetermined, both prior to, and after, Viener's discharge: rampant laxness in internal controls in the areas of responsibility of each of the three shareholders, Jacob's build-up of inventory and unrealistic projections, excessive costs in production and problems

with quality control, excessive chargebacks, cancellations of sales from large customers like J.C. Penney, Rush's failure to book Penney's business, and his weak sales performance, Friedman's reliance on a purchase forecast from Target which choked the company when it did not materialize, Rush and Friedman's failure to book future sales for NGN, and the industrywide slump in the domestic apparel industry, beginning in late 1995, due to offshore competition.

(113) Even though Joffred had the ability to fire Jacobs and Rush, if he did so, Jacobs and Rush could have voted to remove Joffred as president. (N.T. Rush, 8/3/99, p. 361.)

(114) While Joffred was aware of the challenges facing domestic apparel manufacturers, he understood that if the company were well managed, it would succeed. (N.T. Joffred, 8/6/99, pp. 610-11.) Numerous other domestic-based suppliers of apparel survived this competition. ( N.T. Rush, 8/3/99, pp. 276-77).

(115) On July 3, 1997, Viener was sent a letter, following a meeting of Joffred, Jacobs and Friedman, informing him of Joffred, Jacobs, Friedman and Rush's decision to no longer devote their careers to the businesses and advising him that an orderly wind-down was the only responsible course to follow. Joffred requested a special directors' meeting as soon as possible. (Exhibit 31.)

(116) Joffred resigned as president of NGN, in part, because he no longer wanted to be responsible for what Rush, Jacobs and Friedman might do and did not trust them. (*Id.,* pp. 160-61.)

(117) NGN and RGC ceased their operations on or about August 31, 1997. (Exhibit 31.)

## III. DISCUSSION

In the context of a closely-held corporation, the United States District Court for the Western District of Pennsylvania has noted that the "survival of the business association is perilously tied to the continuing vitality of intimate personal relationships." *Orchard v. Covelli* 590 F. Supp. 1548, 1550 (W.D. Pa. 1984). Close corporation shareholders have limited options if they become disenchanted with the way a corporation is being run or how they are being treated. This fact often leads to costly and protracted lawsuits. This is the case before us. Like Judge Weber in *Orchard supra,* we bind ourselves to a careful balance of equities in fashioning appropriate relief under the unique circumstances of this case.

### *Wrongful Discharge*

Plaintiff argues NGN, acting through its board of directors, acted improperly in terminating his employment with NGN.

He also argues RGC, acting through its board of directors, acted improperly in terminating his employment with RGC.

These claims are properly claims against NGN and RGC and since NGN and RGC are in bankruptcy, all proceedings against these corporations are stayed and we cannot proceed further against them until the bankruptcy stay is lifted.

We will, and do, later consider the effect of Viener's discharge from his employment with NGN and RGC in relation to his claim that Jacobs squeezed him out of his positions with NGN and RGC.

## Conspiracy

Plaintiff also seeks damages for the overt acts of Jacobs, Rush, Joffred and Friedman which Viener argues constituted a conspiracy to deprive him of his rights as a minority shareholder.

Generally, the acts of the agents of the corporation are the acts of the corporation. *Daniel Adams Associates v. Rimbach Publishing Inc.,* 360 Pa. Super. 72, 519 A.2d 997 (1987). A single entity cannot conspire with itself, and, similarly, agents of a single entity cannot conspire among themselves. *Rutherfoord v. Presbyterian-University Hospital,* 417 Pa. Super. 316, 333-34, 612 A.2d 500, 508 (1992).

In the case sub judice, the complaint alleges a conspiracy among NGN's agents and is, in effect, an allegation that NGN, and the RGC, each, conspired with itself. A corporation cannot conspire with itself. *Nix v. Temple University,* 408 Pa. Super. 369, 380 n.3, 596 A.2d 1132, 1137 n.3 (1991).

## Breach of Fiduciary Duty

Finally, plaintiff alleges that the majority shareholders, Jacobs and Rush, breached their fiduciary duty of good faith and loyalty by systematically excluding him from any meaningful role in the corporate activities of NGN and RGC for no legitimate business purpose; said exclusion was designed to compel him to dispose of

his interest in these businesses for less than its fair market value. Plaintiff claims this constituted oppressive conduct by the majority shareholders and a violation of their duty to him.

Defendants argue that, under Pennsylvania law, the business judgment rule prevents this court from "second-guessing" the business decisions of corporate management in the absence of fraud, self-dealing or other misconduct, citing *Cuker v. Mikalauskas,* 547 Pa. 600, 692 A.2d 1042 (1997). The business judgment rule insulates an officer or director of a corporation from liability for a business decision made in good faith if he is not interested in the subject of the business judgment, is informed with respect to the subject of the business judgment to the extent he reasonably believes to be appropriate under the circumstances, and rationally believes that the business judgment is in the best interests of the corporation. *Id.* at 606, 692 A.2d at 1045. We find that the business judgment rule does not preclude this court from examining a majority shareholder's oppressive conduct toward a minority shareholder in a closely-held corporation.

Furthermore, plaintiff has presented evidence to establish fraud, self-dealing, self-interest and misconduct by majority shareholder Jacobs.[2]

---

2. We will not address the claim against Rush because of the bankruptcy filing. Viener also claims breach of fiduciary duty against Michael A. Joffred. Joffred was not a majority shareholder of NGN and we find no evidence of liability on his part. We note that, from our vantage point, Joffred's culpability in this matter seemed to stem from his hubris in thinking he could control this herd of cats. The parties have agreed that Friedman had no role in removing Viener from NGN and plaintiff no longer seeks relief from him.

Courts have consistently recognized that the duty of loyalty owed to the corporation by the controlling interest holders includes a duty of loyalty and fairness to minority shareholders. *Orchard, supra* at 1556. (citations omitted) Where a majority shareholder stands to benefit from his decisions as a controlling stockholder, the law requires that the majority's action be "intrinsically fair" to the minority interest, *Id.* Self dealing is present when the minority shareholder is denied the right to participate in the benefits of the corporation, *Id.* It is well recognized that "a majority shareholder has a fiduciary duty not to misuse his power by promoting his personal interest at the expense of the corporate interests." *Id.* at 1557, quoting *United States v. Byrum,* 408 U.S. 125, 92 S.Ct. 2382, 33 L.Ed. 238 (1972).

The Pennsylvania Business Corporation Law of 1988 provides limited protection, under 15 Pa.C.S. §1767, for a minority shareholder who can prove oppressive conduct[3] toward him by the directors or those in control of the closely held corporation.[4] Section 1767, however, only provides for the appointment of a custodian of the corporation on deadlock or other cause.[5]

---

3. The Pennsylvania Commonwealth Court has adopted New York's definition of oppressive acts: "Oppressive actions refer to conduct that substantially defeats the 'reasonable expectations' held by minority shareholders in committing their capital to the particular enterprise." *Gee v. Blue Stone Heights Hunting Club Inc.* 145 Pa. Commw. 658, 604 A.2d 1141, 1145 (1992). (citation omitted)

4. The committee comment to section 1767 makes reference to "oppressive conduct" in the form of freezing-out a minority shareholder by removing him from his various offices or by substantially diminishing his power or compensation.

5. In order to be entitled to this remedy, plaintiff must establish that, in the case of a closely held corporation, the directors or those in

There is little case law under section 1767 to guide the courts. Plaintiff is no longer seeking the appointment of a custodian as NGN has ceased its operations.

Under the common law, majority shareholders have a duty to protect the interests of the minority shareholder. *Ferber v. American Lamp Corp.* 503 Pa. 489, 496, 469 A.2d 1046, 1050 (1983); see also, *ARC Manufacturing Co. v. Konrad*, 321 Pa. Super. 72, 78, 467 A.2d 1133, 1138 (1983). The Pennsylvania Supreme Court has stated that "majority [shareholders] occupy a quasi-fiduciary relation toward the minority which prevents them from using their power in such a way as to exclude the minority *from their proper share of the benefits accruing from the enterprise.*" *Ferber* at 496, 469 A.2d at 1050. (citation omitted) (emphasis in original) "This does not mean . . . that majority shareholders may never act in their own interest, but when they do act in their own interest, it must also be in the best interest of all shareholders and the corporation." *Id.*

Judge Weber, in *Orchard v. Covelli,* 590 F. Supp. 1548 (U.S.D.C. W.D. Pa. 1984), persuasively states:

"Adherence by the majority interest to a fiduciary duty of strict fairness is particularly critical in the context of the closely held corporation. The acute vulnerability of minority shareholders in the closely held corporation is well recognized. It stems principally from two factors. Because of its controlling interest, the majority is able to dictate to 'the minority the manner in

control of the corporation have acted illegally, oppressively or fraudulently toward one or more holders of 5 percent or more of the outstanding shares of any class of the corporation in their capacity as shareholders, directors, officers or employees.

which the corporation shall be run. In addition, shares in closed corporations are not publicly traded and a fair market for these shares is seldom available. In contrast, a partner can act to dissolve a partnership and a shareholder in a large public-issue corporation can sell his stock on the market if he is dissatisfied with the way things are run. Dissension within the close corporation tends to make the minority interest even more unattractive to a prospective purchaser. As a consequence, a shareholder challenging the majority in a close corporation finds himself on the horns of a dilemma, he can neither profitably leave nor safely stay with the corporation. In reality, the only prospective buyer turns out to be the majority shareholder." *Id.* at 1557.

The district court held that any attempt to "squeeze out" a minority shareholder must be viewed as a breach of fiduciary duty. *Id.* at 1557. "The reasons for excluding an obstreperous shareholder may often appear compelling to the majority, and the conduct which eventually leads to a 'squeeze-out' may not have been undertaken with such an intent. Yet the conduct is injurious when the result is the exclusion of minority shareholders without adequate recompense and it is particularly harmful when carried out with malevolence or indifference. The law recognizes a right to recovery under such circumstances." *Id.*

In *ARC Mfg., supra,* the Pennsylvania Superior Court affirmed the chancellor's finding of a breach of fiduciary duty by the shareholders/directors where they, inter alia: called a special meeting without notice to the minority shareholder in attempting to remove him as president, changed the locks on the company premises

and refused to permit the minority shareholder to have reasonable access to the premises while he remained a director of the corporations, attempted to exclude the minority shareholder from access to the business records of the corporation and from participation in meaningful decisions involving corporate affairs, and attempted to transfer the management functions of the board of directors to an executive committee. *Id.* at 80-81, 467 A.2d 1137-38. The Superior Court determined that this was a breach of fiduciary duty and granted the minority shareholder relief, *i.e.* in that case, the appointment of a receiver. The court, in doing this, attempted to preserve the otherwise thriving business which was being threatened by the shareholders' inability to get along with each other. *Id.*

In this case sub judice, the appointment of a custodian is inapplicable because the business is no longer an ongoing concern and has, in fact, gone into bankruptcy.

In *Orchard, supra,* the district court found that the fiduciary duty owed the minority shareholder was all but ignored by the defendant. It found a systematic effort to exclude Orchard from any meaningful role in the corporations, as well as an effort to deny him benefits therefrom by insisting Orchard accept a proposed stock redemption agreement covering Orchard's holdings in six restaurants, without compensation for Orchard's interest in a seventh store. It further found that the defendant exploited his bargaining position to the detriment of the minority shareholder, failed to use his best efforts to procure the continued life of the existing franchises in the names of the corporations by

opening additional restaurants within the corporations' exclusive territory or by use of their operating funds. In the end, Orchard was left with an interest in the corporate shells. *Id.* at 1558. The district court determined that, in order to adequately address Orchard's claim of breach of fiduciary duty and bring the business dealings of the parties to an end, the appropriate remedy was to order the defendants to provide Orchard the fair value of his interest in the corporation at the buyout offer price made in 1977, when the breaches occurred. *Id.* at 1560.

We look to the facts of this case with these principles in mind:

In January 1983, plaintiff Viener and defendants Jacobs and Rush capitalized and incorporated N.G.N. Inc. (the acronym for Neal, George and Norman, their first names), a closely held corporation organized and existing under the laws of Pennsylvania to engage in the textile and apparel business. NGN utilized subcontractors to cut, sew and assemble the garments. Viener, Jacobs and Rush owned all of the issued and outstanding stock of NGN and have continuously constituted the entire board of directors of NGN since its formation. The company's three directors appointed Rush to be chairman and Viener to be president of the company. Each of the three shareholders was assigned specific areas of responsibility: Rush had sales and marketing, Jacobs had production and Viener was responsible for fabric, financial accounting and general administrative functions. Each shareholder earned the same salary for the work he performed for the company. Each investor/owner received special consideration and benefits not

available to the other employees, including luxury cars, disability insurance at $8,000 per month for the duration of any disability of a shareholder, and comprehensive life insurance. The shareholders maintained loan accounts with the corporation (accounts in which the shareholders allowed money they had earned, or which they had advanced to the corporation, to be retained), absent notes or loan agreements, which gave the corporation a source of working capital. Viener supplied the building, without profit, whereby NGN conducted its operations. Viener's experience in the business, particularly yarn and fabric purchasing, was a substantial asset. During Viener's term as president NGN grew dramatically.

NGN purchased fabric and marketed the men's apparel line and RGC marketed the ladies' apparel line, As an owner/investor and officer of NGN and RGC, Viener received detailed information regarding their operations and performance on a regular basis, including weekly reports on the operations and production, the status of financing and cash flow, budgeting information and planning information regarding expansion and acquisition of new facilities. He had access to all of the affiliates' facilities and employees.

From the beginning of the company, the owners/shareholders critiqued and complained of each other's work performance. NGN soon grew even larger and problems arose. Net sales and gross profit margins declined. Dissatisfaction increased among the shareholders: Rush complained about Viener's performance, Viener complained about Jacobs' performance. Blame and finger-pointing began; tensions grew.

Beginning in 1994, Viener expressed legitimate concerns about cash payments that were being made by NGN to one of its subcontractors, Kim Van Vu and her company, N.V. Sportswear, for a line of cheap T-shirts. N.V. Sportswear had grown to become one of NGN's largest subcontractors and Jacobs eventually kept it in operation full-time. Payments were often made to Van Vu in cash; these payments rose from $600 to, in later years, $1,200 per week.

In 1994, Viener asked Michael Joffred, then auditor to NGN, to check into the legality of these cash payments. NGN's board was advised by Robert Firely of Beard & Co., at its May 18, 1994 meeting, that cash payments to Kim NV Inc. were okay since her entity was a corporation. Joffred questioned that representation, but the payments continued, even though Joffred later admitted that cash payments to subcontractors was bad business practice. Viener was dependent on Joffred's advice and counsel and relied on it in permitting continued cash payments to Kim Van Vu at Jacobs' request.

On August 4, 1994, Rush and Jacobs voted to remove Viener as president.

In September 1994, Firely advised Jacobs that the $1,200 per week which was being credited as being paid on account for N.V. Sportswear was in fact for garment repairs and for debt on the marker machine rather than for the cheap T-shirt program, and wrote a memo to confirm the advice.

By October 1994, NGN had hired Joffred as president in order to bring in professional management. In December 1994, Joffred confirmed to Viener that he,

Viener, would not have any meaningful role in the company.

Joffred immediately adopted a policy prohibiting cash payments to subcontractors. Nontheless, in late 1994, at Jacobs' direction, Crown-Globe, a subcontractor of NGN's, submitted invoices of $53,276.59 for "price adjustments" to NGN. Douglas Wolfe, president of Crown-Globe, was aware that these invoices were not due Crown-Globe and were, in fact, a means of getting cash to pay Kim Van Vu.

Jacobs had Wolfe advance almost all the cash back to Jacobs, which Jacobs then gave to Van Vu or N.V. Sportswear, a business entity owned by Van Vu.

NGN received no benefit from this transaction.

We find the payment of the $53,276.59 was made through Crown-Globe to Jacobs, Van Vu and/or N.V. Sportswear to disguise what was being done and make it difficult for Viener and/or an auditor to discover that Jacobs had taken money out of NGN and paid it to himself or his designees.

Jacobs also attempted to do the same thing a second time. He caused Crown-Globe to send invoices for an additional $48,135.61 to NGN in an attempt to get this additional money from NGN to Jacobs and/or Van Vu, without the payment appearing on the books.

Fortunately, Joffred, then president of NGN, refused to pay the invoices.

On January 27, 1995, Viener was advised in a letter that the board had determined to terminate his employment. This initial meeting was held without notice to Viener. Viener was fired as an employee at a February

board meeting but remained a director and shareholder in the businesses. Contemporaneously with Viener's discharge, Rush and Jacobs offered to purchase Viener's stock in NGN and RGC at its book value payable over five years, or alternatively to sell their stock on the same terms. Neither buyout took place, in part, because of the distrust that had arisen between the shareholders.

Then, shortly after Viener's termination, NGN ceased its practice of having regular quarterly board meetings. The locks on the doors at NGN and Ellmar were changed so Viener no longer had physical access to the facilities; Jacobs had a set of keys but Viener did not. A memo was sent to all employees that if they spoke to Viener, they would be fired. Viener was no longer provided with the detailed information he had received as an owner and investor in the companies, and he was excluded from compensation decisions when a compensation committee was set up consisting of all the other shareholders, directors and Joffred, but not Viener. Joffred acknowledged that Viener was fired for asking questions and we find that this is one of the reasons Viener was removed. Viener was labeled as disruptive and lawyers were brought into the fray.

Later in 1995, NGN loaned machinery it owned to Amex, a facility in Mexico, and supplied fabric to it. NGN had for a number of years been looking to acquire a sewing facility offshore to remain competitive by lowering labor costs. Jacobs and Kim Van Vu traveled to El Salvador and Mexico to find such a facility and these trips were paid for by NGN. NGN was never repaid for these expenses once Jacobs and Van Vu bought a facility in their own names.

NGN used Amex and then another Mexican facility for offshore production for a short time, but nothing came of these affiliations. Jacobs himself sought an interest in Amex but did not obtain one.

In December 1996, Jacobs reduced his loan account with NGN by $202,216.67, without a board meeting and without notice to Viener, at a time when the company was very short in cash. NGN acquired no interest in Amex.

By the end of 1996, Jacobs had gotten lazy and admittedly did not do things he should have done to improve production. After a consulting firm was brought in and was critical of his performance, Jacobs was relieved of his production responsibilities and duties. J.C. Penney demanded Joffred take over quality control from Jacobs because of its concerns about the quality and timeliness of deliveries. The losses which NGN and RGC sustained in 1995 and 1996 consumed close to 90 percent of their net worth.

Around 1997, Jacobs and Van Vu bought another Mexican facility, Kimmex, in their own names. Jacobs shipped the Amex equipment he purchased, along with $15,730 worth of NGN equipment, to Kimmex. NGN was not paid for its equipment.

At one point in 1997, Joffred had gone to the NGN plant and saw equipment packed and crated for Mexico. He asked Jacobs, "What the hell is up?" Jacobs replied that the equipment was going to the plant in Mexico, to be used at Kimmex. He explained that it was going to generate cost savings for NGN and RGC. Joffred informed him that these were collateralized assets owned by CoreStates Bank. Jacobs was aware that the agree-

ments with CoreStates prevented the transfer of these assets. After this happened, Joffred prepared a list of all the fixed assets that had been transferred to Mexico. NGN received no benefit from Kimmex and Viener was not given an opportunity to invest in it.

We find Jacobs' transfer of the $15,730 worth of NGN's equipment to Kimmex without compensation to NGN was a misappropriation of NGN's property and was, under the circumstances, outrageous. Jacobs knowingly violated NGN's obligations to CoreStates Bank and his actions could have jeopardized or destroyed NGN's credit.

Jacobs' actions during the time-frame involved were not justified by his willingness to advance money to NGN from time to time. This fact did not, and could not, give Jacobs the right to take NGN's money without corporate approval even though NGN may have owed him money at the time, and it did not give him the right to take NGN's equipment. His position with NGN did not entitle him to treat NGN and its assets as his own.

Early in 1997 or thereabouts, a turnaround specialist was brought in to NGN and it was determined that the company could go forward, but not with Rush and Friedman. These conclusions were not presented to the board or timely disclosed to Viener. Joffred knew that if the company was well managed, despite the challenges facing domestic apparel manufacturers, it could succeed. Numerous other domestic-based suppliers of apparel survived the offshore competition. But even though Joffred had the ability to fire Jacobs and Rush, if he did so, they could just turn around and remove him from office.

In June and July of 1997, Rush and Friedman stopped accepting orders for NGN and RGC, despite the fact that during the prior six months, NGN and RGC had sold approximately $18 million worth of goods, had paid off its $500,000 overadvance, and was still an ongoing concern. Part of the reason they stopped the bookings was the Viener litigation.

The decline in the sales and margins of NGN was multi-determined both prior to, and after, Viener's discharge. There was rampant laxness in internal controls in the areas of responsibility of each of the three shareholders, Viener, Jacobs and Rush. There were unrealistic sales projections and a build-up of inventory, as well as excessive costs in production and problems with quality control under Jacobs' watch. The cancellation of sales from large customers like J.C. Penney's, and Friedman's reliance on a purchase forecast from Target which did not materialize, nearly choked the company. Rush's failure to book Penney's business and his weak sales performance was very costly to NGN. The industry-wide slump in the domestic apparel industry certainly was a large factor in the reduction of sales and margins, but Rush's and Friedman's failure to book future sales for NGN and RGC put the nail in the coffin. Joffred himself was flabbergasted by this conduct, as the company had had $18 million in sales in the prior six months, had paid off a $500,000 overadvance and was still a viable business.

On July 3, 1997, Viener was informed by letter of Joffred, Jacobs, Friedman and Rush's decisions to no longer devote their careers to the businesses and advised him that a wind-down of the business was the only

responsible course to follow. Joffred resigned as president, in part, because he no longer wanted to be responsible for what Rush, Jacobs and Friedman might do and did not trust them, A special directors' meeting was called and NGN and RGC ceased operations on or about August 31, 1997.

We find that, on these facts, plaintiff has established oppressive conduct on the part of majority shareholder Jacobs. We will not be persuaded to overlook Jacobs' misconduct simply because it did not involve a great deal of money or because he loaned money to the company and guaranteed its loans.

We further find that the majority shareholders' decision to strip from Viener any meaningful role in the companies he co-founded was not made under proper circumstances. Jacobs squeezed Viener out of NGN and RGC, by using seemingly legitimate means, because he wanted Viener to go away quietly. Viener was denied access to information, the facilities and then his proper share of the benefits accruing from NGN and RGC. The majority shareholders retaliated against Viener, in part because of this litigation, and left him with an interest in a corporate shell.

We decline to adopt a policy of judicial noninterference where majority shareholders misuse their power to pursue their own self-interests, oppress a minority shareholder for raising legitimate concerns, and fail to protect his interests, which is their duty.

The conduct of Jacobs in causing Crown-Globe to submit invoices to NGN when NGN did not owe Crown-Globe and in causing Douglas Wolfe to then turn that

money over to Jacobs so Jacobs could get cash to Van Vu, is outrageous.

Jacobs also had approximately $218,000 worth of equipment sent to Amex and reduced his loan account with NGN by $202,216.67 for the purchase of this equipment for Kimmex at a time when NGN was very short of cash. When Jacobs then transferred $15,730 worth of NGN equipment to Kimmex, this was never authorized through its president. NGN never got this equipment back and NGN was never paid for it. Neither Joffred, nor NGN's board of directors, nor anyone else other than Jacobs, who had no authority to act for the corporation in this way, approved this transfer. Neither Kimmex nor anyone else paid NGN for this equipment and NGN never received anything of value for the equipment.

Whatever criminal wrongs were or were not done by these transactions, they were unauthorized actions—conversions—designed to reduce NGN's assets and reduce the value of Viener's NGN stock.

We find this course of conduct on Jacobs' part was also outrageous.

For all these reasons, we find Jacobs, as a majority stockholder in NGN, breached his fiduciary duty to Viener and that Viener has established his claim against Jacobs.

We also find that Jacobs excluded Viener from an appropriate role in RGC, being guilty of all the same infractions as he was in regard to NGN, except that Jacobs did not misappropriate any of RGC's money or other assets. We find Jacobs as a majority shareholder in RGC breached his fiduciary duty to Viener as a mi-

nority shareholder in RGC and is liable to Viener as a result.

Majority shareholders in closely held corporations are put on notice that their actions will be judged under a standard of strict fairness to the minority shareholder.

Accordingly, we find that Viener is entitled to relief from Jacobs and furthermore, is entitled to punitive damages from Jacobs because of Jacobs' outrageous conduct in misappropriating NGN's assets and money.

The issue remains—what should be the type and measure of relief which we can grant Viener.

We find the remedy granted by the United States District Court for the Western District of Pennsylvania the appropriate remedy here. *Orchard, supra,* p. 1560.

In *Orchard* the court found a breach of fiduciary duty in a minority stockholder's suit and ordered the defendants, including the majority stockholder, to provide the minority stockholder with the fair value of his interest in the corporation by buying him out.

In *Orchard*, the majority shareholder had offered the minority stockholder a fixed amount for his interest in the corporations involved and the court found the offered price fair and adequate.

We, therefore, will proceed in the case at bar to hear evidence in the damage phase of the trial as to what Viener is entitled to—book value for his shares, as provided in the shareholder agreement (exhibit 5), the fair value of his interest in NGN and RGC or some other proper basis, the date as to when the damages should be fixed, and any related damages, not to include compensation for lost salary.

Although this is not a tort action at law, it is an action involving, as we have determined, outrageous conduct and we find a claim for punitive damages appropriate here. This is not a contract claim.

Therefore, we will hear evidence to determine the appropriate amount of punitive damages which will appropriately punish Jacobs for his outrageous conduct.

## IV. CONCLUSIONS OF LAW

(1) Jacobs breached the fiduciary duty he owed Viener as a majority stockholder in NGN and RGC.

(2) Jacobs is required to purchase Viener's stock in NGN and RGC at an appropriate price, as of an appropriate time.

(3) Jacobs' outrageous conduct makes him liable for punitive damages.

(4) Viener is entitled to punitive damages from Jacobs for Jacobs' outrageous conduct.

We will schedule a date for the trial on damages. At that trial the parties may present evidence to establish the appropriate damages, compensatory and punitive.

Accordingly, we enter the following decree nisi:

## DECREE NISI

And now, June 30, 2000, after a non-jury trial on liability only, and in consideration of the foregoing opinion, the court finds an award in favor of the plaintiff, George Viener, and against the defendant, Neil Jacobs, on Count I, breach of fiduciary duty, and a constructive trust is imposed upon Neil Jacobs, in favor of plaintiff,

in an amount to be determined in the damages phase of the trial.

It is further ordered that judgment is entered in favor of defendants Michael A. Joffred and Nagan Leasing Inc., Energy Knits Inc., Little Creek Mills Inc., Amity Finishing Inc. and G.N.K. Partnership, and against the plaintiff, on Count I, and said defendants are dismissed from this suit.

It is further ordered that Allen Friedman is dismissed as a defendant in this action.

It is further ordered that this action is stayed as to defendants NGN Inc., Reading Garment Company Inc., Ellmar Manufacturing Inc., Reading Dyeing and Finishing Inc. and LCMA Inc. on account of their bankruptcy filing.

It is further ordered that this action is stayed as to defendant Norman Rush on account of his bankruptcy filing.

It is further ordered that Count IV, for conspiracy, is dismissed.

It is further ordered that the damages phase of the non-jury trial be heard on September 7, 2000, at 9:30 a.m., in the courtroom assigned.

The time for filing of exceptions to this decree nisi is continued until 10 days after the damage phase of the non-jury trial has concluded.