**George P. VIENER**

v.

**Neal JACOBS, Norman Rush, Michael A. Joffred, Allen Friedman, N.G.N., Inc., Reading Garment Company, Inc., Ellmar Manufacturing, Inc., Nagan Leasing, Inc., Reading Dyeing and Finishing, Inc., Little Creek Mills, Inc., LCMA, Inc., Amity Finishing, Inc., G.N.K. Partnership.**

**Appeal of: Neal Jacobs.**

Superior Court of Pennsylvania.

Argued April 23, 2003.

Filed Sept. 3, 2003.

Reargument Denied Nov. 17, 2003.

the issue before the trial court, the trial court exceeded this limited review when it decided the natural expansion question, since the Board did not make any findings of fact or conclusions of law on this issue. If the trial court determined that this question was necessary to the resolution of the case, then the proper remedy was a remand to the Board to make findings of fact and conclusions of law regarding that issue.

John J. Miravich, Reading, for appellant.

Rees Griffiths, York, for appellee.

Before: HUDOCK, TODD and POPOVICH, JJ.

POPOVICH, J.

¶ 1 Neal Jacobs (Jacobs) appeals the Judgment entered on July 12, 2001, in the Court of Common Pleas of Berks County. Upon review, we affirm in part, reverse in part and remand.

¶ 2 The tortured procedural history of this case is as follows. George P. Viener (Viener) initiated this action on February 1, 1995, *via* Praecipe for a Writ of Summons. Thereafter, on February 6, 1995, Viener filed a Complaint against his former business partners: Jacobs, Norman Rush (Rush), Michael A. Joffred (Joffred), Allen Friedman (Friedman). The Complaint also named as defendants NGN, Inc.(NGN), a Subchapter S textile corporation, and its following affiliates: Reading Garment Co., Inc. (RGC), Nagan Leasing, Inc. (NLI), Ellmar Mfg., Inc. (EMI), Energy Knits, Inc. (EKI), Reading Dyeing and Finishing, Inc. (RDFI), Little Creek Mills, Inc. (LCM), LCMA, Inc. (LCMA), Amity Finishing, Inc. (AFI), and GNK Partnership (GNK). Viener, Jacobs and Rush were officers of NGN, owned equal

shares of the company and owned varying percentages of interest in its affiliates. Friedman owned a 25½% interest in RDFI, a 25% interest in LCM, a 20% interest in AFI and a 25% interest in RGC. Joffred was an auditor employed by Beard & Company who audited NGN and later was named Viener's replacement as president of NGN after Viener was fired from NGN.

¶ 3 Viener's Complaint alleged that his former business partners conspired to discharge him wrongfully from his position as President of NGN and Secretary/Treasurer of RGC. The Complaint also alleged that Jacobs, Rush and Friedman breached their fiduciary duty to Viener as a minority shareholder and that Jacobs, Rush and Friedman engaged in a civil conspiracy to deprive illegally Viener's rights as a minority shareholder. On March 6, 1995, Jacobs, Rush, Friedman and the corporate defendants filed Preliminary Objections. The trial court granted the Preliminary Objections in part and ordered that the Complaint be dismissed against the corporate defendants due to Viener's failure to name them in the four counts of the original complaint.

¶ 4 Viener filed an Amended Complaint on May 18, 1995. On May 21, 1995, Jacobs, Rush, Friedman and the corporate defendants filed an Answer and Counterclaim. The Answer denied, *inter alia,* any wrongdoing by Jacobs, Rush, Friedman and the corporate defendants. The Answer claimed that Viener was an "at-will"

employee, and his employment could be terminated at any time. In addition, the Counterclaim alleged that Viener had misappropriated and diverted corporate assets in excess of $20,000 for his personal benefit.[1] On July 28, 1995, Viener filed a Motion for a Jury Trial, which the trial court granted.

¶ 5 The case proceeded through pre-trial motions and discovery and, on April 28, 1997, the parties held a pretrial conference, whereat the parties agreed that the case would be tried without a jury on August 4, 1997, which was later continued to August 5, 1997. It was also agreed at the conference that Viener would be given leave to file a Second Amended Complaint.[2] Thereafter, on June 12, 1997, Jacobs, Rush, Friedman and the corporate defendants filed two Motions *In Limine* to exclude the testimony of Stephen A. Cohen and Edward Wilsuz.[3] These motions were denied by the trial court. Viener then filed a Second Amended Complaint which alleged that Jacobs usurped and appropriated a corporate opportunity of NGN by purchasing a sewing facility in Mexico with Kim Van Vu (Van Vu) to produce garments for NGN that would be accounted separately from other NGN sales.

¶ 6 By agreement of the parties, the trial court bifurcated the case and began trial on the issue of liability on August 5, 1997. The trial court deferred disposition regarding the Motions *In Li-*

---

1. This Counterclaim was later withdrawn.

2. It was agreed at the pretrial conference that Jacobs, Rush, Friedman and the corporate defendants would not file Preliminary Objections to the Second Amended Complaint, and Viener agreed that they would not have to file an Answer. Nevertheless, Jacobs, Rush, Friedman and the corporate defendants filed a Preliminary Objection to the Second Amended Complaint on July 21, 1997, because Viener failed to file the Second Amend-

ed Complaint within 20 days as agreed. The trial court did not rule on this Preliminary Objection.

3. Stephen A. Cohen was to present expert testimony regarding management mistakes made by Jacobs, Rush and Friedman, and Edward Wilsuz was to present expert testimony regarding the fair market value of NGN. The trial court did not make a ruling with respect to the Motions *In Limine.*

*mine* and instructed the parties to file a joint document indicating both the stipulated findings of fact and those facts which needed to be determined by testimony. The record indicates that the trial court wished to determine whether Jacobs, Rush, Friedman and the corporate defendants were, in fact, liable to Viener prior to deciding the Motions *In Limine*. The parties presented testimony on August 7–12, 1997, but the trial was continued to January 26, 1998, and later continued to April 16–17, 1998. In the interim, on March 4, 1998, the Honorable Albert Stallone, presiding trial judge, vacated the order scheduling the continuance of trial for April 16th–17th and recused himself due to a perceived conflict of interest. The case was reassigned immediately to the Honorable Forrest G. Schaeffer. Evidently, the Motions *In Limine* were not ruled upon due to the change in jurists and the delay in the continuation of the case thereafter.[4]

¶ 7 Following reassignment of the case to Judge Schaeffer, on April 15, 1998, the trial court scheduled a trial status conference for May 7, 1998. Thereafter, Viener filed a Petition for the Appointment of a receiver for NGN, LCMA, EMI, RDFI and RGC.[5] The trial court issued a Rule returnable May 17, 1998, and stated that if Jacobs, Rush, Friedman and the corporate defendants were to file an answer that raised a dispute as to the material facts or issues of law regarding the Petition, an evidentiary hearing would be held on June 5, 1998. Jacobs, Rush and the corporate defendants filed an Answer on May 18, 1998. Thereafter, the scheduled evidentiary hearing was continued from June 5th to

July 10, 1998, October 13–14, 1998 and November 6, 1998.[6]

¶ 8 Testimony on the Petition for Appointment of a receiver began on August 3, 1999, and was concluded on August 6, 1999. Thereafter, on August 6th, the trial court appointed a liquidating receiver for NGN, LCMA, EMI, RDFI and RGC. On September 3, 1999, the receiver requested authority from the trial court to file for protection pursuant to the United States Bankruptcy Code, Title 11 U.S.C § 101, *et seq.*, on behalf of NGN, LCMA, EMI, RDFI and RGC, which the trial court granted. Accordingly, the trial court stayed all pending matters with respect to NGN, LCMA, EMI, RDFI and RGC pending the disposition of the bankruptcy proceedings. Rush also filed for protection under the United States Bankruptcy Code on February 25, 2000.

¶ 9 Following submission of proposed Findings of Fact and Conclusions of Law from the parties, the trial court entered a Decree *Nisi* setting forth its Findings of Fact and Conclusions of Law with respect to the liability phase of trial on June 30, 2000. The trial court first found that all proceedings against Rush, NGN, RGC, EMI, LCMA and RDFI remained stayed as a result of their bankrupt status. *See Viener v. Jacobs*, 51 Pa. D. & C. 4th 260, 261 (C.P.Berks, 2000). The suit against Joffred, Friedman, NLI, EKI, RDFI, LCM, AFI and GNK was dismissed because Viener did not present evidence at trial to show that they were liable to Viener. *Id.*, 51 Pa. D. & C. 4th at 261. Viener's claim for wrongful discharge was dis-

---

4. Because these Motions *In Limine* were not ruled upon before trial, during trial or after trial, and the testimony they sought to limit was presented at trial, we will consider them constructively denied, and we will consider the issues raised within the Motions preserved.

5. Viener amended his Petition orally to include NGN, which the trial court granted.

6. Testimony regarding the liability phase of trial was presented on July 10, 1998, October 13–14, 1998, and November 6, 1998.

missed because it found the claim was, in reality, a claim against NGN. *Id.,* 51 Pa. D. & C. 4th at 281. The trial court also dismissed Viener's conspiracy claim against Jacobs, Rush and Friedman because they were acting as agents of NGN when Viener was fired, and, therefore, NGN could not conspire against itself. *Id.,* 51 Pa. D. & C. 4th at 281. However, the trial court concluded that Jacobs, as majority shareholder, owed a fiduciary duty to Viener, as minority shareholder, and that Jacobs' conduct in "freezing out" Viener was outrageous and oppressive. *Id.,* 51 Pa. D. & C. 4th at 295. Therefore, the trial court concluded that Jacobs was liable to Viener for compensatory and punitive damages resulting from the breach of fiduciary duty to Viener. *Id.,* 51 Pa. D. & C. 4th at 298. Lastly, a constructive trust was imposed on Jacobs for the amount of damages to be determined in the damage phase of the trial. *Id.,* 51 Pa. D. & C.4th at 299.

¶ 10 The damage phase of trial was held on September 7, 8, 12, 20 and 28, 2000. After submissions of Proposed Findings of Fact and Conclusions of Law from the parties, the trial court entered an award in favor of Viener in the amount of $1.2 million dollars in compensatory damages and $1 million dollars in punitive damages. Jacobs filed Post–Trial Motions, which were denied by the trial court. Thereafter on July 12, 2001, the Judgment was recorded. Jacobs filed a timely Notice of Appeal to this Court on August 9, 2001, and an ordered statement of matters complained of on appeal pursuant to Pa.R.A.P.1925(b). On October 11, 2001, before the trial court filed its Pa.R.A.P.1925(a) Opinion, Jacobs sought Chapter 7 Bankruptcy protection, and this appeal was automatically stayed by the United States Bankruptcy Court for the Eastern District of Pennsylvania. The trial court, nevertheless, filed a Pa. R.A.P.1925(a) Opinion on October 25, 2001,

that addressed Jacobs' issues in the event that his Bankruptcy petition was dismissed. Thereafter, the automatic stay was lifted, and the appeal was reinstated.

¶ 11 Appellant presents the following questions for our review:

1. Did the trial court [err] when it found that Viener was frozen-out of [NGN]?

2. Did the trial court [err] when it found that Jacobs breached his fiduciary duty but refused to apply the business judgment rule to Jacobs' conduct?

3. Did the trial court [err] when it relied on the federal case of [*Orchard v. Covelli,* 590 F.Supp. 1548 (W.D.Pa.1984)] to measure damages rather than making a specific finding what damage, if any, Jacobs caused?

4. Did the trial court [err] when it relied on Viener's damage expert who had no foundation for his opinion?

5. Did the trial court [err] when it refused to permit Jacobs to offer evidence that Viener removed assets of the Company?

6. Did the trial court [err] in awarding Viener [$1 million dollars in punitive damages] when Jacobs' conduct did not meet the level of outrageousness necessary to award such damages?

7. Did the trial court [err] by awarding Viener [$1 million dollars in punitive damages] when Viener did not prove that the character of the act, the nature and extent of the harm to Viener and the Jacobs' worth warranted such a recovery?

8. Did the [trial court err] by awarding [$1 million dollars in punitive damages] because the award was unconstitutional as grossly excessive by

not bearing a reasonable relationship to the facts of record?

Jacobs' brief, at 3–4.

¶ 12 We note first that this appeal arises from the trial court's adjudication of Viener's claim of breach of fiduciary duty. A claim of breach of fiduciary duty sounds in equity, and, as such, our standard of review is limited. *See Liberty Prop. Trust v. Day–Timers, Inc.,* 815 A.2d 1045, 1048 (Pa.Super.2003). We will reverse only where the trial court was "palpably erroneous, misapplied the law or committed a manifest abuse of discretion." *Day–Timers,* 815 A.2d at 1048 (*citing Thermo–Guard, Inc. v. Cochran,* 408 Pa.Super. 54, 596 A.2d 188, 193 (1991)). Where there are any apparently reasonable grounds for the trial court's decision, we must affirm it. *Id.,* 815 A.2d at 1048.

¶ 13 We also note that the present case proceeded as a non-jury trial. When reviewing the results of a non-jury trial, we are bound by the trial court's findings of fact, unless those findings are not based on competent evidence. *Thatcher's Drug Store v. Consolidated Supermarkets, Inc.,* 535 Pa. 469, 477, 636 A.2d 156, 160 (1994). Absent an abuse of discretion, we are bound by the lower court's assessment of credibility of the parties. *Id.,* at 477, 636 A.2d at 160.

¶ 14 We address Jacobs' first and second claims jointly. In essence, Jacobs contends that the trial court's findings that he and the other shareholders "froze-out" Viener, the minority shareholder, were not supported by the record, and, in any event, the activities of Jacobs and the other majority shareholders were protected by the "business judgment rule."

¶ 15 The trial court's Findings of Fact in its Opinion of June 30, 2000, reveal the following: Viener and his father were in the textile business in the Reading area for more than 50 years. Jacobs was employed by the Viener family business and was eventually offered a 20% ownership interest in the Viener family business. Viener and Jacobs began producing garments for a company that employed Rush, who was a college friend of Viener. Together, Viener, Rush and Jacobs decided to begin their own company and formed NGN on January 1, 1983. The three owned 33⅓% interests in NGN. Viener served as president/secretary/treasurer of NGN, Jacobs and Rush served as vice-presidents. The three were subject to a shareholder's agreement that guaranteed each shareholder that he could sell his shares at the current book value of NGN to the other shareholders.

¶ 16 The present case arose when Viener expressed concerns in 1994 regarding questionable cash payments authorized by Jacobs, whose duties were to manage manufacturing and quality control, and made by NGN to one of its subcontractors, N.V. Sportswear and its majority shareholder, Van Vu. *See Viener,* 51 Pa. D. & C.4th at 269. Initially, Viener acquiesced to the unorthodox cash payments based on the advice of Joffred, then NGN's auditor. *Id.,* 51 Pa. D. & C. 4th at 270. At that time, Rush indicated that he wished to make Joffred an officer in the company. Initially, Viener supported that plan and wanted to employ Joffred as chief financial officer. Shortly thereafter, Jacobs and Rush voted to remove Viener as president of NGN against Viener's wishes and demoted him to vice-president.[7] Joffred then replaced Viener as president of NGN. Eventually, Joffred suspended NGN's practice of making cash payments to subcontractors. Nevertheless, in late 1994, at Jacobs' direction, Crown–Globe, Inc.

---

7. Viener retained the same salary in the vice-president position that he had as president.

(Crown–Globe), another subcontractor of NGN, generated false invoices of $53,276.59 to reflect "price adjustments" to NGN. *Id.*, 51 Pa. D. & C. 4th at 272. Thereafter, Jacobs caused NGN to pay the $53,276.59 to Crown–Globe, who in turn repaid Jacobs. Jacobs then paid the $53,276.59 directly to Van Vu. *Id.*, 51 Pa. D. & C. 4th at 273.

¶ 17 Viener questioned Joffred *via* e-mail regarding the cash payments. At trial, Joffred confirmed that the invoices were fraudulent and were an inappropriate attempt by Jacobs to divert cash payments to Van Vu and N.V. Sportswear in contravention of corporate policy. *Viener*, 51 Pa. D. & C. 4th at 274. Thereafter, Joffred prevented NGN from paying to Crown–Globe a second series of invoices that totaled $48,135.61. Viener was then voted out of his position as vice-president of NGN by Jacobs and Rush on Joffred's recommendation. Evidence presented at trial indicates that Joffred intended to fire Viener as vice-president for "wasting people's time with questions." N.T. Trial, 8/11/1997, at 134–135. Viener remained on NGN's board of directors after being fired but his participation on the board was limited severely. Following Viener's termination, NGN ceased its regular practice of quarterly board meetings, and the locks and doors at NGN were changed to permit Viener access to NGN's facilities only during hours of regular operation. Employees of NGN were warned that if they spoke to Viener, they would be fired. Finally, Viener was excluded from voting on issues of employee compensation because Jacobs and Rush established a committee consisting of all of the other shareholders, directors and Joffred to handle those matters.

¶ 18 In late 1995, following Viener's termination, the sales of both NGN and RGC fell off, and they sustained losses of approximately $900,000. In 1996, NGN and RGC lost $2.33 million. At this time, NGN loaned textile equipment valued at approximately $218,000 to Amex, a corporation in Mexico, at Jacobs' request. *Viener*, 51 Pa. D. & C. 4th at 276. This equipment was collateral for a loan held with CoreStates Bank, and the loan documents with CoreStates Bank prevented the transfer of these assets. Moreover, despite dwindling capital accounts, Jacobs withdrew $202,216.67 from his loan account for the purpose of purchasing the equipment loaned to Amex.[8] Neither the equipment purchased nor the funds used to purchase the equipment were returned to NGN by Jacobs, instead, part of the equipment located at Amex was transferred to Kimmex, a second facility in Mexico owned by Jacobs and Van Vu.[9] The balance of the equipment at Amex was sold, and the funds acquired from the sale were reinvested in equipment for Kimmex.

¶ 19 While the Kimmex transactions were taking place, Jacobs allowed his responsibilities at NGN to lax. As a result, J.C. Penney, a major client of NGN, demanded that Joffred take over responsibility for quality control because of its concerns regarding the quality of NGN's merchandise and the timeliness of deliveries. *Viener*, 51 Pa. D. & C. 4th at 278. Joffred took over quality control from Ja-

---

8. The shareholder loan accounts contributed to NGN's working capital and earned interest at 12% *per annum*. The shareholders took their profit distributions and loaned money back to NGN as part of its capital account. There were no agreements or understandings as to the terms or timing of loan payments. The shareholders made advances or withdrawals irregularly. *Viener*, 51 Pa. D. & C. 4th at 267.

9. We note that Viener was never given an opportunity to invest in Kimmex.

cobs, but NGN's viability continued its rapid decline, and the company ceased operations on August 31, 1997. *Id.,* 51 Pa. D. & C. 4th at 279–280.

¶ 20 We note first that Jacobs frames his argument as a challenge to the trial court's legal determination that Viener was "frozen out" of NGN. However, an analysis of Jacobs' brief indicates that a large part of his argument with respect to his first two claims attacks the factual determinations of the trial court without contending expressly that the trial court's factual findings were unsupported by the record. As such, Jacobs presents an alternative interpretation of the facts of this case. However, we will not find that the trial court abused its discretion where there is a mere "difference of opinion" regarding an interpretation of the facts. Rather, an abuse of discretion is found only in flagrant cases where there is *not* a substantial ground for difference of opinion. *Miller v. Krug,* 255 Pa.Super. 39, 386 A.2d 124 (1978). We have reviewed the Findings of the trial court and have determined that they are supported by the record, and we are therefore satisfied that the trial court did not abuse its discretion with respect to the facts that it found. *See Thatcher's Drug Store,* at 477, 636 A.2d at 160.

¶ 21 It is axiomatic that majority shareholders have a duty not to use their power in such a way to exclude minority shareholders from their proper share of benefits accruing from the enterprise. *See Ski Roundtop, Inc. v. Hall,* 265 Pa.Super. 266, 401 A.2d 1203, 1209 (1979). "[The aforementioned principle] does not mean that majority shareholders may never act in their own interest, but when they do act in their own interest, it must also be in the best interest of all shareholders and the corporation." *See Ferber v. American Lamp Corp.,* 503 Pa. 489, 496, 469 A.2d 1046, 1050 (1983). Pennsylvania law holds that an attempt by a group of majority shareholders to "freeze out" minority shareholders for the purpose of continuing the enterprise for the benefit of the majority shareholders constitutes a breach of the majority shareholders' fiduciary duty to the minority shareholders. *See Weisbecker v. Hosiery Patents, Inc.,* 356 Pa. 244, 258, 51 A.2d 811, 817 (1947).

¶ 22 In the present case, the record indicates that Jacobs, in conjunction with Rush, acted to "freeze out" Viener, the minority shareholder, from obtaining a proper share of the benefits that accrued from the enterprise. As found by the trial court, after Viener complained about Jacobs' practices to Joffred, he was removed from his position of responsibility and prevented from providing a role in the governance of the corporation which his expertise helped build due to "wasting peoples' time with questions." Following Viener's termination in 1995, his chief means of access to the company's financial documents was *via* a discovery order from the trial court and periodic financial statements. Further, at Jacobs' direction and with Rush's assent, NGN's assets and opportunities were squandered while the company was in dire financial straights in a bizarre corporate machination designed to benefit Jacobs and his confidant, Van Vu. This evidence alone is sufficient to demonstrate that Jacobs (and Rush) "froze out" Viener from a meaningful role in NGN's operation. *See, e.g.,* 15 Pa.C.S.A. § 1767 comment (a "freeze out" occurs in closely held corporation when minority shareholder is removed from office or his power or compensation is substantially diminished).

¶ 23 The trial court was not swayed by the testimony presented with regard to Viener's alleged mismanagement of NGN, no doubt due to both the evidence present-

ed by Viener indicating that Jacobs (and Rush) limited Viener's role as a shareholder-director, and the self-dealing practices of Jacobs that occurred before and after Viener's termination. Of course, the trial court, as fact-finder, was free to believe all, part or none of the testimony presented and weigh its credibility. *See Majczyk v. Oesch,* 789 A.2d 717, 726 (Pa.Super.2001). The trial court heard all testimony, weighed it and found that Jacobs' testimony was not credible. Therefore, we discern no error on the part of the trial court when it concluded that Jacobs breached his fiduciary duty to Viener.

¶ 24 We are also satisfied that the trial court was correct when it determined that the "business judgment rule" did not insulate Jacobs (and Rush) from liability for "freezing out" Viener. The "business judgment rule" insulates an officer or director of a corporation from liability for business decisions made: (1) in *good faith;* (2) where the director or officer *is not interested in the subject of the business judgment;* (3) is informed with respect to the subject of the business judgment to the extent he reasonably believes to be appropriate under the circumstances; and (4) rationally believes that the business judgment in question is in the best interests of the corporation. *See Cuker v. Mikalauskas,* 547 Pa. 600, 692 A.2d 1042 (1997) (emphasis added).

¶ 25 The crux of this case is Viener's contention that he was "frozen out" of meaningful participation in the governance of the corporation that he co-founded as a result of the complaints he had with respect to inappropriate business practices by NGN that were authorized by Jacobs and assented to by Rush that led to the eventual decline of the NGN and its affiliates. Therefore, the "business judgment rule" would not insulate Jacobs (and Rush) from liability in this case, because the is-

sue is the prevention of a shareholder-director's participation in the governance of a closely held corporation, as opposed to the power of the corporation to manage its property and conduct its business affairs. As such, judicial determination of this issue requires an analysis of the equitable relationship between Viener and Jacobs and, therefore, does not implicate matters left to the business judgment of NGN's corporate officers or directors. *Cf. Warehime v. Warehime,* 777 A.2d 469, 479 (Pa.Super.2001) (judicial review of equitable corporate obligations does not impute the "business judgment rule") (citation omitted). Accordingly, Jacobs' first and second claims fail.

¶ 26 Jacobs' remaining claims challenge the trial court's determination of damages. Jacobs first contends that the trial court erred when it relied on *Orchard v. Covelli,* 590 F.Supp. 1548 (W.D.Pa.1984). We note that Jacobs failed to present this argument to the trial court in his Pa. R.A.P.1925(b) Statement, and, therefore, it is waived for purposes of review. *See McKeeman v. Corestates Bank, N.A.,* 751 A.2d 655, 658 (Pa.Super.2000) (citation omitted).

¶ 27 Jacobs contends next that the trial court erred in its calculation of compensatory damages because Viener failed to prove the extent and amount of damages resulting from Jacobs' actions. *See, e.g., Gordon v. Trovato,* 234 Pa.Super. 279, 338 A.2d 653, 654 (1975) (plaintiff must establish by evidence such facts as will furnish basis for legal assessment of damages). Jacobs also argues that the trial court found improperly that he alone was required to pay damages to Viener.

¶ 28 After a review of the record, we are satisfied that the trial court did not err when it calculated the compensatory damages applicable to Jacobs in this case.

The record reveals that the trial court ordered Jacobs to pay $1.2 million dollars in compensatory damages, which represented the fair value of Viener's interests in NGN and RGC as of December 31, 1994. The trial court did not assign the "book value" valuation to Viener's stock provided by the shareholder agreement between Viener, Jacobs and Rush because the shareholder agreement was silent regarding situations in which a shareholder was terminated involuntarily. Therefore, the agreement did not apply. *See Seven Springs Farm Inc. v. Croker*, 748 A.2d 740, 744 (Pa.Super.2000) (contract that fails to provide for a specific contingency is silent, not ambiguous). Nevertheless, when seeking a settlement of this case, Jacobs and Rush offered to pay Viener only the "book value" of the stock instead of its actual value because of the shareholder's agreement, and, accordingly, Viener was effectively compelled to retain his illiquid investment. Therefore, the trial court set December 31, 1994, as the proper date for valuation of Viener's stock, because December 31st was prior to his "freeze out" and, thus, represented a date when Viener still reaped the benefits of NGN and RGC. The trial court concluded correctly that the proper method to calculate damages was to determine the actual value of Viener's stock prior to the date of his discharge because to choose a date after discharge would allow Jacobs to profit from his oppressive conduct towards Viener.

¶ 29 Jacobs' argument that the trial court erred when it found that he alone was required to pay damages to Viener is entirely without merit. Jacobs' co-defendants were either dismissed due to their bankrupt status or because they were not liable to Viener. If the case could have proceeded against Rush, the other majority director, the trial court could have found him jointly and severally liable to Viener with Jacobs. However, Rush was insulated from adjudication as a result of the automatic stay. Thus, Jacobs remained as the sole non-bankrupt defendant, and, consequently, damages were assessed properly against him.[10]

¶ 30 Next, Jacobs claims that the trial court erred in relying on Viener's expert witness, Edward Wilsuz, who valued Viener's stock as of December 31, 1994, to determine damages. Jacobs claims that Wilsuz's estimation of the value of Viener's stock was not based on sufficient facts because he was unaware that NGN and RGC filed separate tax returns and that Viener did not have a 33⅓% interest in RGC. It is well settled that expert testimony is incompetent if it lacks an adequate basis in fact. The expert is allowed only to assume the truth of testimony already in evidence. *Hussey v. May Dept. Stores, Inc.*, 238 Pa.Super. 431, 357 A.2d 635, 637 (1976). While an expert's opinion need not be based on an absolute certainty, an opinion based on mere possibilities is not competent evidence. *Niggel v. Sears, Roebuck and Co.*, 219 Pa.Super. 353, 281 A.2d 718 (1971). This means that expert testimony cannot be based solely upon conjecture or surmise. An expert must do more than guess. His or her assumptions must be based upon such facts as the jury would be warranted in finding from the evidence. *Houston v. Canon Bowl, Inc.*, 443 Pa. 383, 278 A.2d 908 (1971).

10. Jacobs also argues that the trial court failed to recognize that Viener incurred a tax-benefit from the losses incurred by NGN and its affiliates while he held the stock. This argument is without merit. The purpose of Viener's investment was to generate profit, not to incur a tax-benefit from the loss of his investment.

¶ 31 In his determination of Viener's stock value, Wilsuz utilized three distinct methods. In the first method, called an "asset value" approach, Wilsuz relied on both NGN's tax returns for the years 1990–1994 and a joint financial statement produced in 1997. The second method of valuation, the "comparative company" approach consisted of a comparison of NGN to 10 similar apparel companies. This method led to a value of $6 million dollars, which the trial court did not adopt. The final method of valuation, upon which Wilsuz based his conclusion of value, was the "present value of future earnings" approach. This method consisted of an examination of NGN and RGC's earnings prior to 1995 and a mathematical prediction of value based on those earnings. Wilsuz concluded that, based on this approach, NGN and RGC were worth $5.5 million dollars in 1994. Wilsuz then divided $5.5 million dollars by three (to reflect his assumption that Viener owned ⅓ of both companies), which equaled $1.835 million dollars. Wilsuz then applied a 35% "minority shareholder's discount" to the $1.835 million dollar figure (to reflect the illiquid nature of the stock) leading him to conclude that Viener's stock in NGN and RGC was worth $1.2 million dollars on December 31, 1994.

¶ 32 Thus, it is clear that Wilsuz based his calculations on the assumption that there were three investors in RGC (instead of four). N.T. Damage Trial, 9/7/2000, at 233–234. The trial court informed Wilsuz that, in fact, RGC had four directors. In an effort to address Wilsuz's computational error Viener asked hypothetically whether the value of RGC would affect NGN's value if RGC operated at a "break-even" level. N.T. Damage Trial, 9/8/2000, at 254. Wilsuz opined that his assessment of NGN's value, and, thus, Viener's stock value, would not change despite his erroneous assumption that Viener

held ⅓ interests in both companies, provided that RGC operated on a "break-even" basis. N.T. Damage Trial, 9/8/2000, at 261.

¶ 33 Wilsuz's hypothetical assumption does not suffice to "cure" his error in the calculation of the value of Viener's stock. There is no evidence of record to indicate that RGC was a "break-even" company, and it is clear that RGC's value in 1994 would have either a positive or negative effect on Viener's aggregate stock value. As our Supreme Court held in *Houston:*

> The facts which are assumed to be true for purposes of a hypothetical question put to an expert witness must be put in evidence by witnesses other than the expert himself. The opinion of the expert does not constitute proof of the existence of facts necessary to support the opinion.

*Houston,* at 385–386, 278 A.2d at 910 (citation and quotation marks omitted).

¶ 34 As there were no facts present in the record to suggest that RGC was a "break even" company, we conclude that Wilsuz did not have sufficient facts on which to base his opinion of Viener's stock value, and, accordingly, the trial court's assessment of damages is erroneous. *See Houston,* at 385–386, 278 A.2d at 910. Further, because Wilsuz failed to assess a separate value of RGC, it is impossible for this Court to correct his computational error with respect to the percentage of Viener's ownership in RGC. Therefore, we are constrained to reverse the trial court's compensatory damage award and remand the case so the trial court may, with sufficient facts, determine the proper amount of compensatory damages.

¶ 35 Jacobs' next claim alleges that the trial court erred when it refused to allow Jacobs to present evidence that

Viener removed assets of NGN as a set-off of the damage award. Jacobs attempted to raise this issue *via* a Motion to Amend his Answer for a Set–Off Claim at the commencement of the damages trial. Whether a party may amend pleadings is a matter of judicial discretion. *See Carpitella v. Consolidated Rail Corp.*, 368 Pa.Super. 153, 533 A.2d 762, 763 (1987). Amendments should be allowed at any stage of the adversary process to secure a decision of the case on its merits, unless unfair surprise or prejudice to the other party would result or the proposed amendment is against a positive rule of law. *Id.*, 533 A.2d at 763. If the amendment contains allegations which could have been included in the original pleading, as is the usual case, then the question of prejudice is presented by the *time* at which it is offered rather than by the substance of what is offered. *See Bata v. Central–Penn National Bank of Philadelphia*, 448 Pa. 355, 293 A.2d 343, 357 (1972). The possible prejudice, in other words, must stem from the fact that the new allegations are offered *late* rather than in the original pleading. *Bata*, 293 A.2d at 357.

■ ¶ 36 In the present case, Jacobs had several months following the end of the liability phase of trial and the commencement of the damages phase of trial to amend his Answer, yet he did not, leaving Viener unprepared to defend himself against the allegations contained in the Motion. Further, as the trial court observed, NGN's property interests were being handled by the U.S. Bankruptcy Trustee, and the trial court was without jurisdiction to entertain the claim. Therefore, we are satisfied that the trial court was correct in its denial of Jacobs' Motion because it caused an unfair surprise and prejudice to Viener. Accordingly, we dismiss Appellant's claim.

■ ¶ 37 Jacobs' remaining issues challenge the trial court's award of punitive damages. We are able to analyze the legal question of whether it was proper for the trial court to assess punitive damages despite our determination that the trial court's compensatory damage calculation was erroneous. *See, e.g., Kirkbride v. Lisbon Contractors, Inc.*, 521 Pa. 97, 102, 555 A.2d 800, 803 (1989) (basis for punitive damages is derivative of *cause of action*, not compensatory damage award).

¶ 38 In *Judge Tech. Servs. v. Clancy*, 813 A.2d 879 (Pa.Super.2002), we stated:

Punitive damages are awarded to punish a defendant for certain outrageous acts and to deter him **or others** from engaging in similar conduct. Under Pennsylvania law, a reasonable relationship must still exist between the nature of the cause of action underlying the compensatory award and the decision to grant punitive damages.

[ . . . ] If no cause of action exists, then no independent action exists for a claim of punitive damage since punitive damages is only an element of damages. To this extent, punitive damages must, by necessity, be related to the injury-producing cause of action.

The degree of reprehensibility is the primary indicator of the reasonableness of a punitive damages award. The reprehensibility inquiry takes into consideration the fact that some wrongs are more blameworthy than others.

Importantly,

The standard under which punitive damages are measured in Pennsylvania requires analysis of the following factors: (1) the character of the act; (2) the nature and extent of the harm; and (3) the wealth of the defendant. [ . . . ]. Moreover, in Pennsylvania, punitive damages are awarded for outrageous conduct, that is, for acts done with

a bad motive or with a reckless indifference to the interests of others. An amount of an award of punitive damages will not be reversed unless it shocks the Court's sense of [conscience].

*Judge Tech. Servs.*, 813 A.2d at 888–889 (citations and quotation marks omitted) (emphasis in original).

■ ¶ 39 Jacobs argues that our holding in *Pittsburgh Live, Inc. v. Servov,* 419 Pa.Super. 423, 615 A.2d 438 (1992), requires this Court to reverse its award of punitive damages. We disagree. In *Servov,* we held that when fraud is the basis of compensatory damages, the same fraudulent conduct is not sufficient to base an award of punitive damages without a showing of acts of malice, vindictiveness or a wholly wanton disregard of the rights of others. *Servov,* 615 A.2d at 442. We have reviewed the record of this case extensively, and we are satisfied that the trial court acted properly in assessing punitive damages against Jacobs. As the facts presented above demonstrate, Jacobs' actions (with Rush's assent) led to the usurpation of Viener's right to participate in the governance of a corporation that Viener co-founded. As the trial court found, Jacobs' misuse of corporate funds and property coupled with his failure to undertake sufficient measures to procure the continued success of NGN led to its ultimate failure. We agree with the trial court's conclusion that minority shareholders in closely-held corporations are particularly vulnerable to this type of wanton neglect and bad faith, and it is therefore necessary to punish this behavior to ensure that it will not occur in future cases.

■ ¶ 40 In its consideration of whether to impose punitive damages, the trial court also examined Jacobs' personal wealth. Jacobs claims that the trial court erred in including several assets held jointly with his wife and others in the computation of his personal wealth for purposes of determining the proper amount of punitive damages. This argument is without merit. Merely because an asset is not subject to levy and execution does not mean that it cannot be utilized to determine an individual's personal wealth. Jacobs also presents several other arguments that the trial court miscalculated his liabilities in its determination of punitive damages. These arguments are unavailing and are contrary to the facts found by the trial court. Therefore, we dismiss them. Lastly, we note that evidence of personal wealth is not mandatory in the determination of punitive damages. *See Shiner v. Moriarty,* 706 A.2d 1228, 1242 (Pa.Super.1998). Rather, the polestar for the trial court's analysis is the degree of the defendant's reprehensible conduct. *Shiner,* 706 A.2d at 1241. As indicated above, we are satisfied that the trial court did not abuse its discretion when it found Jacobs' conduct reprehensible such that punitive damages were proper to deter Jacobs and others from engaging in the same type of conduct. *See Judge Tech. Servs.,* 813 A.2d at 888. Accordingly, Jacobs' claim fails.

■ 41 Nevertheless, because we find it necessary to remand for a recalculation of compensatory damages, we do not reach Jacobs' argument that the *amount* of punitive damages awarded was unconstitutionally excessive. We are guided in our judgment by the recent decision of the United States Supreme Court in *State Farm Mutual Automobile Ins. Co., v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). Writing for the Court, Mr. Justice Kennedy stated, "Our jurisprudence and the principles it has now established demonstrate [...] that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm,* at ——,

123 S.Ct. at 1524. The current ratio between punitive damages and compensatory damages is less than a 1 to 1 ratio. However, as the ratio between punitive damages and compensatory damages in this case may change as a result of our remand, we reach a decision only as to the *propriety* of punitive damages in this case so that, on remand, the trial court may recalculate the *amount* of the punitive damage award, if necessary, to comport with Mr. Justice Kennedy's admonition.

¶ 42 In sum, we affirm the judgment in part, but we remand for a proper assessment of the value of NGN and RGC as of December 31, 1994, and a recalculation of compensatory and, potentially, punitive damages to reflect Viener's proper share of ownership in each company.

¶ 43 Judgment affirmed in part, reversed in part. Remanded for proceedings consistent with this Opinion. Jurisdiction relinquished.