J-A31028-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| DENNIS HOUSER, ADMINISTRATOR OF THE ESTATE OF DEBRA J. BECKER, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| FORD MOTOR COMPANY AND K & H FORD, INC. | |
| Appellee | No. 709 MDA 2014 |

Appeal from the Order Entered March 24, 2014
In the Court of Common Pleas of York County
Civil Division at No(s): 2008-SU-006261-01

BEFORE:  BOWES, J., OTT, J., and STABILE, J.

MEMORANDUM BY OTT, J.:                    **FILED APRIL 21, 2015**

Dennis Houser, administrator of the estate of Debra J. Becker, deceased, ("Houser") appeals from the order entered March 24, 2014 in the Court of Common Pleas of York County, granting summary judgment in favor of Ford Motor Company and K & H Ford, Inc., (collectively, "Ford") and against Houser, in this products liability action. Houser raises the following issues: (1) whether the court erred in granting summary judgment due to a lack of medical expert opinion; and (2) in the alternative, whether the court erred by not allowing Houser leave to provide an expert report. Based on the following, we affirm.

The trial court set forth the facts and procedural history as follows:

[Houser] commenced the above-captioned action as a result of injuries sustained by [Houser]'s sister, now Decedent, Debra J. Becker, (hereinafter, "Decedent") in a motor vehicle accident on December 29, 2006 in York County, Pennsylvania. Decedent, who was under the influence of alcohol and had blood-alcohol level of 0.28, rear-ended a Jeep Cherokee that was stopped at a stop sign. At the time of the accident, Decedent owned and operated a 1995 Ford Escort GT which was purchased from Defendant, K & H Ford, Inc. (hereinafter, "K&H"). **[Houser] avers that as a result of the accident, the vehicle's driver side airbag improperly deployed, causing blunt force trauma to the Decedent and eventually death. More specifically, [Houser]'s Complaint alleges that the deployment of the airbag in Decedent's vehicle caused a rupture in Decedent's aortic arch. [Houser] avers the Ford Escort was defective in that it lacked an appropriate amount of sensors to allow for timely deployment of the airbag during a crash**.

[Houser] initiated this action by filing a Writ of Summons on December 22, 2008. [Houser] reinstated the Writ on February 13, 2009 and March 24, 2009. On November 4, 2009, [Houser] filed the Complaint. Defendant K&H filed Preliminary Objections to [Houser]'s Complaint on November 24, 2009. The matter originally came before this Honorable Court in 2010 in which the Court sustained Defendant K&H's Preliminary Objections, but did not dismiss the Complaint against Defendant K&H. On June 24, 2010, [Houser] filed a Motion for Service Pursuant to Special Order of Court on Defendant K&H. That Motion was granted on September 7, 2010.

On February 4, 2010, Defendant, Ford Motor Company, filed an Answer with Affirmative Defenses. [Houser] filed a Reply to New Matter of Defendant, Ford Motor Company, on February 12, 2010. On December 27, 2010, Defendant K&H filed an Answer with New Matter. [Houser] filed a response on January 18, 2011.

On October 1, 2012, Defendant, Ford Motor Company, (hereinafter "Ford Motor") filed a Motion for Summary Judgment and Brief in Support thereof. [In the motion, Ford argued Houser had not provided any evidence to establish a defect existed in the vehicle at the time of the accident which caused or contributed to his damages.] Ford Motor filed a Praecipe to List Case for One-Judge Disposition on October 1, 2012. [Houser]

- 2 -

filed a response and brief in support thereof on October 29, 2012. On January 1, 2013, this Honorable Court denied Defendant Ford Motor's[] Motion for Summary Judgment. On December 2, 2013, Defendant K&H Ford [and Defendant Ford Motor] filed a Motion for Summary Judgment and Brief in Support thereof.[1] [Ford's] Motion for Summary Judgment raise[d] two issues: whether Decedent is an intended user of the motor vehicle and whether Decedent assumed the risk. On December 24, 2013, [Houser] filed a Response in Opposition to the Motion for Summary Judgment and a Memorandum of Law in Support thereof. This case was listed for one-judge disposition on January 13, 2014 and assigned to this Honorable Court on February 4, 2014.

On February 6, 2014, [Ford] filed a Supplemental Motion for Summary Judgment and Brief in Support thereof. Defendants' Supplemental Motion for Summary Judgment raise[d] the issue of causation.

Trial Court Opinion, 3/25/2014, at 2-4 (emphasis added).

In its supplemental motion, Ford alleged the following, in pertinent part:

5. In support of his claims …[, Houser] has identified as a liability expert and submitted the report of Ralph L. Hensler, Ph.D., who issued an opinion that the driver's side airbag was defective in that it deployed a few milliseconds later than he believed was optimal.

…

7. The engineering opinion of R.L. Hensler only addresses what that expert believes to have been a defect in the air bag system, and does not purport to constitute an expert opinion as to the cause of death, or enhanced injuries resulting from such alleged defect, since the said witness is not a medical doctor.

---

[1] This was technically Ford Motor's second motion for summary judgment.

- 3 -

8. The Hensler report merely speculates based on statements in the medical records that [Decedent] died because of a ruptured aorta caused by the airbag. The Hensler report makes the presumption that the medical records "*impl*[*y*] aggressive contact with the deploying airbag" (page 7); and it states that the [D]ecedent died "*presumably*" due to contact with the air bag (page 2). However, the medical records do not make any reference to the airbag causing the injury.

9. The speculative opinions of Dr. Hensler are not supported by the medical records. The medical records do not attribute [Decedent]'s death to an alleged late deployment of an airbag, the theory advanced by Dr. Hensler.

10. [Houser] has not submitted the report of any medical expert containing a competent opinion about the cause of [Decedent]'s death, and whether her death was causally related to the alleged milliseconds of delay in deployment of the airbag. The Hensler report does not, for example, opine that a timely deployment of the air bag would have led to a different result, nor does it compare or analyze the forces to which the [D]ecedent would have been subjected in a timely deployment versus an alleged untimely deployment and the effect of those varying forces on the [D]ecedent.

11. In short, [Houser]'s sole liability expert provides only an engineering opinion; he cannot and did not issue a competent opinion as to the cause of [Decedent]'s injury and death, and he cannot and did not issue a competent opinion that the failure to use an alternative design enhanced the [D]ecedent's injuries.

Ford's Supplemental Motion for Summary Judgment, 2/6/2014/ at 3-5 (citations and footnote omitted; italics in original). Ford indicated this case falls under the "crashworthiness doctrine," which is a subset of strict products liability law. *Id.* at 5.[2] Ford contended Houser failed to offer the

---

2   The term "crashworthiness" means "the protection that a motor vehicle affords its passengers against personal injury or death as a result of a motor
*(Footnote Continued Next Page)*

- 4 -

requisite testimony on the "causation" element of the crashworthiness test. *Id.* at 6.

On February 27, 2014, Houser filed a Response in Opposition to Ford's Supplemental Motion for Summary Judgment and Brief in Support thereof. Oral argument on the December 2, 2013, Motion for Summary Judgment and the February 6, 2014, Supplemental Motion for Summary Judgment was held on March 13, 2014. On March 25, 2014, the trial court denied the motion for summary judgment but granted the supplemental motion for summary judgment based on the following:

> Given the totality of the circumstances, the Court finds that Decedent was both an intended user of the vehicle and was using it for its intended use. The Court also finds that assumption of the risk defense does not bar [Houser] from recovering as [Ford] failed to submit any evidence that [Decedent] had subjective knowledge of the defect causing the injury and appreciated the danger involved before using the product. **Lastly, the Court finds [Houser] failed to submit evidence establishing the causal connection between the defect of Decedent's airbag and Decedent's ultimate death**.

Trial Court Opinion, 3/25/2014, at 10 (emphasis added). Houser filed a motion for reconsideration, followed by a notice of appeal on April 23, 2014.[3]

_(Footnote Continued)_  ——————————

vehicle accident." ***Kupetz v. Deere & Co., Inc.***, 644 A.2d 1213, 1218 (Pa. Super. 1994).

[3] On April 28, 2014, the trial court ordered Houser to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Houser filed a concise statement on May 15, 2014. The trial court issued an
_(Footnote Continued Next Page)_

- 5 -

In Houser's first issue, he asserts the trial court erred in granting summary judgment on Ford's crashworthiness argument, specifically his lack of any medical expert opinion supporting the causation element. Houser's Brief at 8. Houser states Ford fails to cite any authority which requires that expert testimony, including medical expert testimony, be used to satisfy the crashworthiness test. *Id.* Nevertheless, he alleges there was ample evidentiary support, which will be discussed in detail below, identifying Decedent's cause of death as blunt force trauma. *Id.* at 9.

We begin with our well-settled scope and standard of review:

Our scope of review of an order granting summary judgment is plenary. [W]e apply the same standard as the trial court, reviewing all the evidence of record to determine whether there exists a genuine issue of material fact. We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered.

Motions for summary judgment necessarily and directly implicate the plaintiff's proof of the elements of his cause of action. ... Thus, a record that supports summary judgment will either (1) show the material facts are undisputed or (2) contain insufficient evidence of facts to make out a *prima facie* cause of action or defense and, therefore, there is no issue to be submitted to the [fact-finder]. Upon appellate review, we are not bound by the trial court's conclusions of law, but may reach our own conclusions. The appellate Court may disturb the trial court's order only upon an error of law or an abuse of discretion.

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯

opinion pursuant to Pa.R.A.P. 1925(a) on May 19, 2014, referring to its March 25, 2014 order and opinion as applicable. The court also denied the motion for reconsideration on May 6, 2014.

- 6 -

*Stein v. Magarity*, 102 A.3d 1010, 1013 (Pa. Super. 2014), *quoting*

*DeArmitt v. New York Life Ins. Co.*, 73 A.3d 578, 585-586 (Pa. Super.

2013) (citations and quotation marks omitted).

Moreover, with respect to the "crashworthiness" doctrine, we are

guided by the following:

> The Pennsylvania Supreme Court has adopted the strict products liability doctrine enunciated in Section 402(a) of the Restatement (Second) of Torts. *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966). As such, to submit a Section 402(a) products liability case to a jury, it must be shown that "a product was sold in a defective condition unreasonably dangerous to the user or consumer, and that the defect was the proximate cause of the plaintiff's injuries." *Walton v. Avco Corp.*, 530 Pa. 568, 576, 610 A.2d 454, 458 (1992). Additionally, courts of this Commonwealth have specified that a product is defective when it is not fit for the intended use for which it was sold. *Azzarello v. Black Bros. Co. Inc.*, 480 Pa. 547, 559, 391 A.2d 1020, 1027 (1978).
>
> The crashworthiness or second collision doctrine is merely a subset of a Section 402(a) products liability action and routinely arises in the context of a vehicular accident. *Kupetz v. Deere & Company, Inc.*, 435 Pa. Super. 16, 644 A.2d 1213, 1218 (Pa. Super. 1994), *appeal denied*, 539 Pa. 693, 653 A.2d 1232 (1994). Historically, a Section 402(a) strict products liability action only created liability for injuries proximately caused by a defect where the defect also caused the accident. *Barris v. Bob's Drag Chutes & Safety Equipment, Inc.*, 685 F.2d 94, 99 (3rd Cir. 1982). However, the crashworthiness doctrine extends the liability of manufacturers and sellers to "situations in which the defect did not cause the accident or initial impact, but rather increased the severity of the injury over that which would have occurred absent the design defect." *Kupetz*, 644 A.2d at 1218 (*citing* *Mills v. Ford Motor Co.*, 142 F.R.D. 271 (M.D. Pa. 1990)). Therefore, in order for a manufacturer to avoid liability, it must design and manufacture a product that is "reasonably crashworthy", or alternatively stated, the manufacturer must contemplate accidents among the intended uses of its product. *Kupetz*, 644 A.2d at 1218.

…

To prevail on a crashworthiness or second collision theory in a products liability action under Section 402(a), a plaintiff must prove three elements. First, the plaintiff must demonstrate that the design of the vehicle was defective and that when the design was made, an alternative, safer, practicable design existed. ***Kupetz***, 644 A.2d at 1218 (*citing **Craigie v. General Motors Corp.***, 740 F. Supp. 353 (E.D. Pa. 1990)). Second, the plaintiff must show what injuries, if any, the plaintiff would have received had the alternative safer design been used. ***Id.*** Third, the plaintiff must prove what injuries were attributable to the defective design. ***Id.***

***Colville v. Crown Equip. Corp.***, 809 A.2d 916, 922-923 (Pa. Super. 2002)

(footnotes omitted).[4]

Turning to the present matter, the trial court opined the following:

[Ford] argue[s] that [Houser] has failed to provide an expert opinion showing that the alleged design defect in the Ford Escort caused [Decedent] to suffer a rupture in her aortic arch. Primarily, [Ford's] argument focuses on the fact that Decedent's medical records do not provide any support to [Houser]'s assertion that a defect of the airbag in the vehicle caused the alleged injury. The medical records only indicate that Decedent suffered blunt force trauma from either impact with the other vehicle or an airbag. The medical records do not mention a "late-firing" airbag.

[Houser] provided an expert report from R.L. Hensler, Ph.D., an engineer. Dr. Hensler, in his report, stated that Decedent's airbag fired later than what he believed to be optimal, thereby placing the Decedent within the airbag's

_____

[4] We note that even though Decedent was not involved in a second collision, the crashworthiness doctrine is still applicable because Houser is advancing a strict products liability claim based on the theory that properly designed airbag sensors would have prevented Decedent's death during the accident. ***See Colville***, 809 A.2d at 924 (applied crashworthiness doctrine to a single collision incident).

deployment zone. Dr. Hensler's opinion is that Decedent's airbag was defective; but, because he is not a medical expert, he does not and cannot offer an opinion establishing that the airbag's defect was the proximate cause of [D]ecedent's death.

As such, [Houser] has failed to submit any evidence which would establish that the defect of Decedent's airbag was the source of injury and ultimate death of Decedent. On account of this, the Court finds that [Houser] has failed to establish the causal link between the alleged defect of a late-firing airbag and Decedent's death.

Trial Court Opinion, 3/25/2014, at 9-10.

As mentioned above, Houser alleges there is ample evidence to support his argument linking Decedent's cause of death to the allegedly defective sensors. Houser's Brief at 9. He points to the following as satisfying the burden that a *prima facie* cause of action existed:[5] (1) the expert report of expert, Ralph Hensler, Ph.D.; (2) the medical records and death certificate; (3) the police incident investigation report; (4) the testimony from the responding emergency medical technician ("EMT"), Scott Dean; and (5) the crash investigation report completed by Calspan Corporation, an entity that performs crash research on behalf of the United States Department of Transportation. *Id.* at 9-12. With respect to the treating physicians, the coroner, the investigating officer, and the responding EMT, Houser argues "these fact witnesses can provide testimony

_____

[5] Although Houser terms his argument as there are no material facts in dispute, it is clear from the trial court's opinion that it focused on whether there was sufficient evidence of facts to make out a *prima facie* case. **See Stein v. Magarity**, 102 A.3d at 1013.

as set forth in the medical records, death certificate and police report allowing the jury to draw the link between the defective airbag system and the [D]ecedent's injuries." *Id.* at 12. Furthermore, he contends:

> [T]he cause of death is apparent from the factual evidence in the case and both the Court and the jury can make its own determination from its experience vis-à-vis motor vehicle accidents to determine if the low speed impact between the vehicles or the extreme forces involved in the air bag[,] inflation and the deployment "in the 150 mph range" as noted in Dr. Hensler's report, were responsible for the rupture of [D]ecedent's aorta.

*Id.* Houser also states, "Although Dr. Hensler is not a medical expert, his qualifications certainly render him more than qualified to offer an opinion about the forces involved in an air bag deployment and whether those forces would expose a human being to 'blunt force trauma.'" *Id.*

We disagree with Houser's argument. Our review of the record reveals no basis to disturb the court's ruling that Houser failed to establish the causation element of the crashworthiness test. First, the police incident investigation report stated, in relevant part: "A Dauphin County Coroner advised that [Decedent] had succumbed to internal injuries resulting from blunt force trauma, and further advised result as to alcohol content in [Decedent]'s system." Houser's Response In Opposition to Ford's Motion for Summary Judgment, 2/27/2014, Exhibit A at 6.[6] Second, the post-operative medical records indicated Decedent's diagnosis as "[n]ear completed

---

[6] *See also id.*, Exhibit E at 5.

traumatic intrathoracic aortic transection just distal to the left subclavian artery" and also as "an aortic transection due to blunt force trauma." *Id.*, Exhibit B at 1; Exhibit C at 1. Third, the death certificate stated that Decedent's cause of death was "aortic arch rupture." *Id.*, Exhibit D at 1. Fourth, the responding EMT, Dean, testified that it was his "impression" that "the major internal trauma [that Decedent suffered] was from the vehicle, from [Decedent] hitting the steering wheel and from the airbag." *Id.*, Exhibit G at N.T., 10/24/2013, at 46 (Deposition of S. Scott Dean).

Fifth, the crash investigation report, completed by Calspan, "focused on the severity of the crash and the source of injury that contributed to the death of a 54-year old female driver[, Decedent,] of a 1995 Ford Escort." Moreover, it stated:

> [Decedent's] Escort struck the back of a stopped 2003 Jeep Grand Cherokee at a three-leg intersection which resulted in minor severity frontal damage to the Escort and the deployment of the Escort's frontal air bag system. The female driver was seated in a mid to forward track position and was in the path of the expanding air bag. The driver's air bag expanded against her chest which resulted in a complete laceration of the aortic arch.
>
> …
>
> The driver was heavily intoxicated with a police reported BAC of .289. She was seated in a forward track position and unrestrained. It was possible that the driver was slumped forward immediately prior to impact. At impact, the first generation frontal air bag system deployed. The driver was within the path of the deploying driver's air bag as she responded to the frontal crash forces. The expanding air bag contacted the chest of the driver which resulted in a complete laceration of the aortic arch.

- 11 -

*Id.*, Exhibit H at 1, 7.

Lastly, with respect to Hensler, he has a Ph.D. in physics. *Id.*, Exhibit I at 2. He is a former director for Breed Technologies, a company that supplied airbag crash detection sensors to Ford, and he was in charge of developing sensor calibration software and new sensor and airbag technology from 1989 to 1997. *Id.* In his report, he made the following conclusions with respect to Decedent's accident:

> The Calspan report and the medical records state that Ms. Becker died because of a ruptured aorta resulting from blunt force trauma which implies aggressive contact with the deploying airbag. **Given her small stature**, [Decedent] is in a category of drivers **most susceptible to injuries of this type simply because they are located in closer proximity** to the steering wheel than a taller person. If the airbag fires 10 to 20 milliseconds late, then there is an **increasing likelihood** that [Decedent] would be in the deployment zone at the time of deployment. The problem is exacerbated if you consider that [Decedent] is a 5% female, so she would be positioned closer to the steering wheel prior to deployment because of her seat position. Thus[,] the assumed 5 inch movement during the crash would mean **she would be inside the deployment zone even if the airbag deployed on time**. The degree of further movement into the deployment zone increases rapidly depending on the time delay in firing late. Deployment speeds for airbags are in the 150 mph range and are the highest when measured closer to the steering wheel. When near fully deployed, a well designed airbag drops to near zero velocity. Thus short drivers are far more susceptible to severe injury or death in cases of late deployments because the driver is inside the deployment zone when the airbag deploys.
>
> Based on my inspection and documents I have reviewed, I am of the opinion that:
>
> 1 – The airbags fired late because of the extreme outboard location of the point of impact.

2 – The late deployment resulted in [Decedent] being in the deployment zone at the time the driver side airbag deployed resulting in her chest being exposed to extreme levels of force from the inflation of the airbag and contributing to her death. The impact ruptured her aorta. [Decedent] was a short person closer to a 5% female in terms of relative size and was seated in close proximity to the steering wheel vs. a 50% male which was assumed in the sensor calibration process.

3 – The sensor location contributed to the late deployment and had they been mounted further apart or if a third sensor had been added, the crash could have been detected in a timelier manner thus deploying the airbag before [Decedent] entered the deployment zone.

4 – Ford did not conduct sufficient low speed extreme offset vehicle to vehicle crash testing to see if the firing time response was acceptable for the sensor calibration chosen.

5 – The decision by Ford to use two frontal sensors versus a greater number of sensors also contributed to the death of [Decedent]. Placing sensors outboard of the radiator was possible leading to a shorter delay time in firing….

6 – The sensor system in this vehicle is a defective design which is a substantial contributing factor in the death of [Decedent].

*Id.* at 7-8.

We conclude Houser has failed to produce sufficient evidence establishing a *prima facie* case that a delay defect in the sensors caused the rupture. In regards to the medical records, death certificate, and police report, this evidence describes the accident and the cause of death, a ruptured aorta caused by blunt force trauma, but does not attribute the injury to the deployment of the airbag. With respect to the responding EMT's testimony, while Dean states it was his "impression" that the trauma Decedent suffered was the result of Decedent hitting the steering wheel and

- 13 -

the airbag, he does not provide any explanation on a link between an allegedly defective airbag system and the Decedent's injuries.

Lastly, and of most importance, the Caplan and Hensler reports provide no medical explanation as to how the late-firing impact of an airbag causes an aortic rupture. The reports merely state the airbags expanded against Decedent's chest, which resulted in the laceration of the aorta, but do not provide a medical explanation as to how the impact ruptured the aorta. Moreover, Hensler is not a medical expert nor did he present any medical expert evidence to support his conclusion. He makes assumptions that the delay in the deployment of the airbags caused the ruptured aorta[7] but does not present any evidence to explain how the trauma occurred. "It is well settled that expert testimony is incompetent if it lacks an adequate basis in fact," and that, "[w]hile an expert's opinion need not be based on an absolute certainty, an opinion based on mere possibilities is not competent evidence." *Viener v. Jacobs*, 834 A.2d 546, 558 (Pa. Super. 2003). Furthermore, Hensler also opines there was a possibility that Decedent would have been in the "deployment zone" even if the airbags deployed in a timely manner based on her small stature. Therefore, we conclude the evidence was insufficient to establish *prima facie* case that the defective

_____

[7] For example, Hensler notes there was "an increasing likelihood" that Decedent was in the deployment zone at the time of deployment. Houser's Response In Opposition to Ford's Motion for Summary Judgment, 2/27/2014, Exhibit I at 7.

- 14 -

airbag sensors **caused** Decedent's aortic arch rupture, resulting in her death. Accordingly, because Houser did not provide any other evidence to support his causation argument, we find Hosuer's first argument fails.

With respect to Houser's second issue, as an alternative, he contends he should be permitted time to retain a medical expert to opine on the causation element of the crashworthiness test. **See** Houser's Brief at 13. He states Ford would not suffer any prejudice because the deadline for providing expert reports had not passed when he made the request. **Id.** Moreover, he contends his request "for leave to provide an expert report was reasonable and should have been granted particularly where the record evidence clearly identified the [D]ecedent's cause of death, and no evidence was proffered by [Ford] through an expert or otherwise disputing same." **Id.** at 15.

> With respect to this claim, we are guided by the following:
>
> Although parties must be given reasonable time to complete discovery before a trial court entertains any motion for summary judgment, the party seeking discovery is under an obligation to seek discovery in a timely fashion. **Kerns v. Methodist Hosp.,** 393 Pa.Super. 533, 574 A.2d 1068, 1074 (1990). Where ample time for discovery has passed, the party seeking discovery (and opposing summary judgment) is under an obligation to show that the information sought was material to their case and that they proceeded with due diligence in their attempt to extend the discovery period. **Id.,** 574 A.2d at 1074.

**Reeves v. Middletown Athletic Ass'n**, 866 A.2d 1115, 1124 (Pa. Super. 2004). **See also Fort Cherry School Dist. v. Gedman**, 894 A.2d 135, 140 (Pa. Super. 2006) (reasoning "[t]he Pennsylvania Rules of Civil Procedure do

- 15 -

not give [parties] an unlimited amount of time to conduct discovery"). However, this Court has previously stated that the purpose of Rule 1035.2 "is to eliminate cases prior to trial where a party cannot make out a claim or defense after relevant discovery has been completed; the intent is not to eliminate meritorious claims prematurely before relevant discovery has been completed." ***Burger v. Owens Illinois, Inc.,*** 966 A.2d 611, 618 (Pa. Super. 2009) (quotation omitted).

A review of the record reveals Ford filed the supplemental motion for summary judgment in February of 2014, over four years after Houser instituted the suit against Ford in November of 2009.[8] Discovery began shortly thereafter. On August 30, 2013, the trial court entered a case management order, setting the discovery extension deadline for November 30, 2013, the deadline for Houser's expert reports to be January 15, 2014, and the deadline for Ford's expert reports to be April 15, 2014. ***See*** Case Management Order, 8/30/2013, at 1. The court also ordered that motions for summary judgment and briefs were to be filed no later than May 20, 2014, and opposition responses were due 30 days therafter. ***Id.*** Houser's discovery request for a medical expert was filed **after** Ford filed the supplemental motion, which was also after the expiration of his own expert reports deadline. ***See*** Houser's Response in Opposition to Ford's

---

[8] We also note Ford filed the initial motion for summary judgment in October of 2012.

Supplemental Motion for Summary Judgment, 2/27/2014, at unnumbered 12. Houser had approximately four years to engage in discovery relevant to the issue of causation.[9] *See Wolloch v. Aiken*, 815 A.2d 594, 597 (Pa. 2002) (holding trial court properly entered summary judgment against plaintiff where plaintiff did not submit an expert report before close of discovery period). Therefore, Houser's second argument also fails. Accordingly, we discern no abuse of discretion and/or error on the part of the trial court in granting Ford's supplemental motion summary judgment in this matter.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/21/2015

_____

[9] Moreover, Houser did not allege that he proceeded with due diligence in his attempt to extend the discovery period. *Reeves*, 866 A.2d at 1124.

- 17 -